[Crim. No. 1793.  Second Appellate District, Division One.—June 16, 1930.]

THE PEOPLE, Respondent, v. MARTIN A. LEACH et al., Appellants.

444

Dudley Robinson and Harry C. Miller for Appellant Leach.

Elwin L. Eckert for Appellant Hurlburt.

U. S. Webb, Attorney-General, John L. Flynn, Deputy Attorney-General, Buron Fitts, District Attorney, and Tracy Chatfield Becker, Deputy District Attorney, for Respondent.

CRAIG (ELLIOT), J., *pro tem.*—The appellants Martin A. Leach and Frank Hurlburt, with twenty-five other persons, were joined as defendants in an indictment containing thirty-nine counts or separate charges. The first count charged all the defendants with a conspiracy to issue and sell mortgage notes and evidences of indebtedness of the Pacific Southwest Loan and Mortgage Corporation without first obtaining a permit from the corporation commissioner and to obtain money and property by false representations in the sale of such mortgage notes. The jury disagreed upon count 1. Each of the other thirty-eight counts charged twenty-six of the defendants (i. e., all but defendant Griffin) with either grand theft or a violation of the Corporate Securities Act. Eight defendants were not apprehended, or at least were not placed on trial. During the trial the charges were dismissed against thirteen defendants, either for insufficiency of the evidence or that they might be used as witnesses for the prosecution. The case was submitted to the jury as to six defendants. Four of these were acquitted. The appellant Frank Hurlburt was convicted upon one charge of grand theft contained in count thirty-eight and he was acquitted on all the other counts as to which the jury agreed. The appellant Martin A. Leach was convicted upon twelve counts of grand theft and fourteen counts of violation of the Corporate Securities Act and was acquitted upon eight counts of grand theft. During the course of the trial the court dismissed counts 6, 7, 25 and 26 as to all defendants. The counts of grand theft on which appellant Leach was convicted are counts 2, 10, 14, 15, 16, 18, 19, 20, 29, 31, 32 and 38 and the counts of violations of the Corporate Securities Act upon which he was convicted are counts 3, 5, 9, 11, 13, 21, 24, 28, 30, 33, 34, 35, 36 and 39.

In the fall of 1925 Martin A. Leach bought on contract 320 acres of land in the city of San Diego, state of Califor-

nia, for $9,600. Shortly thereafter he caused the Pacific Southwest Loan & Mortgage Corporation, a corporation, to be formed in the state of Delaware. In January, 1926, he went to Las Vegas, Nevada, with his attorney and others, where a meeting of the corporation was held. There he transferred the San Diego property, subject to a mortgage of $3,000, to said corporation in exchange for 12,500 shares of its preferred stock and 3,200 shares of its common stock (par value of $10 per share). Appellant Leach returned to Los Angeles and thereafter transferred portions of the stock to other parties.

An engineer was employed to survey the property and to lay out a subdivision, which he did. A map of the tract was made and submitted to the San Diego city planning commission, amendments were recommended and made, but the map was never accepted by the planning commission and all descriptions of lots were therefore by metes and bounds. The National Loan Company, a Delaware corporation, had been organized on or about March 1, 1926, by defendant C. A. Birney. Thereafter appellant Leach acquired all the stock and became the sole owner of that company. He remained such sole owner throughout the period covered by the transactions involved under the indictment.

The Pacific Southwest Loan & Mortgage Corporation, under the guidance of appellant Leach, adopted the method of putting individual mortgages on separate pieces of property. The company's attorney (not an attorney of record herein) was asked for a written opinion upon the legality of issuing the mortgages to the National Loan Company, which latter company would sell them to brokers and dealers, and the written opinion so given is in evidence in the case. This opinion does declare the proposed procedure to be legal and not to be a violation of the Corporate Securities Act, in the opinion of the attorney. However, appellant Leach concedes, as is the law, that erroneous advice of an attorney does not prevent an act from constituting a violation of the Corporate Securities Act if such act would constitute such violation in the absence of such advice. (*People* v. *McCalla*, 63 Cal. App. 783 [220 Pac. 436].) Neither corporation ever applied for nor obtained a permit to sell securities in California.

The general facts are that proposed subdivision was of about 160 acres; that each lot was approximately 50 feet on street frontage and 150 feet in length; and that the Pacific Southwest Loan & Mortgage Corporation by general resolution authorizing the issuing of notes in the denominations of $500 and $1,000 and the securing of same by separate mortgages on one lot and two lots respectively of the proposed subdivision, payable in five years to the National Loan Company, interest at eight per cent per annum, in consideration of fifty per cent on the face of each note (later reduced to forty per cent). The notes were not sold and delivered and paid for even as between the two corporations in a lump sum, that is, as a whole. The system used was apparently that whenever Leach (as the National Loan Company) had the opportunity to dispose of a mortgage note he obtained from the Pacific Southwest Loan & Mortgage Corporation an executed note and mortgage to the National Loan Company and the latter corporation assigned same, without recourse, to the customer. The various transactions were not fully traced as between the corporations, but apparently the proceeds of the transactions were (as to the corporation) first received by appellant Leach (under the name of the National Loan Company), then, when converted into money, the Pacific Southwest Loan & Mortgage Corporation received its fifty per cent (later reduced to forty per cent) of the face of the note and the National Loan Company retained all proceeds above said per centum. From this excess over the per centum the National Loan Company paid the expenses of sale, including particularly the commissions of salesmen.

Until we reach count 38 herein we shall be concerned only with the points raised by appellant Leach and by "appellant" we shall mean appellant Martin A. Leach.

Appellant's first contention is that a real estate mortgage is not a security within the purview of the Corporate Securities Act of the state of California. Appellant has discussed this as a general proposition. It cannot be so discussed, but must be considered in the light of the facts of each particular case. Principles of law applicable to a single mortgage loan made upon the property of the mortgagor or to a series or succession of mortgages so made as legitimate loans have no controlling influence upon this

case. Here we must look through the form and consider the real substance of the transactions. Appellant's own explanation is that instead of syndicating the tract to beneficial unit holders as has often been done by others, it was deemed more economical to the parties interested to employ the mortgage note system above referred to in order to raise the funds with which to develop and market the subdivision and that it was figured that the discounts on the mortgage notes would amount to less in the aggregate than ultimate profits to unit holders (exclusive of the promoters) of a syndicate method of financing. A part of the proceeds from the various transactions apparently did go into the improving of the subdivision, but a large portion of the proceeds went directly or indirectly into a separate venture of the Pacific Southwest Loan & Mortgage Corporation, referred to as the Los Buenos Ranchos or Tahiti Beach property.

As declared in section 2, subdivision 7 (c) of the Corporate Securities Act [Stats. 1925, p. 962], "security" includes: " . . . (c) All bonds, debentures and evidence of indebtedness issued by any corporation; . . . excepting therefrom the following: (1) . . . promissory notes not offered to the public by the . . . maker, or underwriter thereof, and all mortgages . . . of property situated in this state, executed to secure the payment thereof; . . . "

A promissory note secured by a mortgage is now recognized both by the business world and by law as something different from a bond or a debenture. (*Underhill* v. *Santa Barbara etc. Co.*, 93 Cal. 300 [28 Pac. 1049] ; *Bank of Newman* v. *Monterey County etc. Co.*, 48 Cal. App. 263 [191 Pac. 970]), yet "in their nature as contracts there is no essential difference between bonds and promissory notes" (7 Cal. Jur. 89), and as between bond and debenture it is difficult to distinguish. Under technical law they appear to be synonymous, although modern business apparently has given them a few distinguishing features not material to the case. Suffice to say, as to bond, debenture and promissory note, within the intention of above quoted portions of the Corporate Securities Act, each is a written promise to pay a fixed sum of money. They are of the same generic class of things and therefore the rule of statutory construction that "where general words follow par-

ticular ones, the former are construed as applicable to the persons or things of the same kind, class or nature"—is not violated by our holding "promissory note" to be included within "evidence of indebtedness." The fact that such promissory note is secured by a mortgage does not change the note into something of a different kind, class and nature, than it would be if unsecured.

That mortgage notes are included within the said word "security" is strengthened by the words of the exception as above set forth, clearly indicating the intention of the legislature *not* to except promissory notes secured by mortgages of property situated in this state when *offered to the public*.

Appellant argues that the mortgagee has no concern with money loaned, that he acquires as mortgagee no right or expectancy to question, either the efficiency, honesty or integrity of the mortgagor or his affairs; that he has loaned a sum of money without limitation upon the disposition of that money, and that he does not look to the success or failure of the mortgagor's business interests to repay the loan, but solely to his mortgage and a deficiency judgment against the borrower, if the mortgaged property proves insufficient; and that there is no reason for conferring upon the corporation commissioner power to maintain a supervision over the affairs of borrowers since the lender himself has no such power. Appellant further states: "But a bond issue, a stock issue, or an investment of such a nature that successful management is necessary to give reasonable assurance to investors that their money will not be dissipated or misappropriated, is quite a different matter; in such instances the investor has the right to demand that the proceeds of his investment be used in a particular way in line with the duties and obligations created by law, so that concerning securities of that character the reason for the supervision by the corporation commissioner is at once apparent."

Looking through the form of the transactions we see notes for substantial sums secured only by lots of relatively small value, and under appellant's own plan as declared by him, the difference in valuation was to be created by the improvement and development of the land into a *bona fide* subdivision and the actual improvements were to have been

paid for from the proceeds of the sales of mortgage notes. Surely, under these circumstances, we have a situation, where (to use appellant's own words) "the investor has a right to demand that the proceeds of his investment be used in a particular way . . . so that concerning securities of that character the reason for the supervision by the corporation commissioner is at once apparent."

The general purpose of the Corporate Securities Acts of the various states was said in *Hall* v. *Geiger-Jones Co.,* 242 U. S. 539 [Ann. Cas. 1917C, 643, L. R. A. 1917F, 514, 61 L. Ed. 480, 37 Sup. Ct. Rep. 217], to be: "To protect the public against the imposition of unsubstantial schemes and the securities based upon them."

After careful consideration of the entire record in this case we can find but one conclusion and that is that the whole matter was a deliberate attempt to circumvent the Corporate Securities Act, defeat its beneficial purposes, and to unload upon a trusting public mortgage notes for a consideration far in excess of their reasonable value, either then present or reasonably prospective. We hold that under all the facts in this case, and the lots being, severally, of but small value, the fact that each note was secured to the extent of a lot (on the basis of one lot to each $500 of face of note) was not sufficient to make the notes something other than "evidence of indebtedness issued by any company" within the meaning of that expression in the Corporate Securities Act.

Appellant's second point is that "provisions requiring the permit of the corporation commissioner to mortgage real estate are unconstitutional." Here again we must say that we cannot give consideration to appellant's contention and argument except in the light of the facts of the case before us. Appellant's said second point is fully answered by our holdings, hereinabove declared, that the transactions taken as a whole constituted a scheme far exceeding a mere matter of mortgages on real property. The Corporate Securities Act in principle has been held constitutional by the United States Supreme Court in *Hall* v. *Geiger-Jones Co., supra,* and by the Supreme Court of the state of California in *In re Girard,* 186 Cal. 718 [200 Pac. 593].

Appellant's third point is that "the sales of the notes and mortgages by the National Loan Company did not

constitute an offer to the public by the maker and issuer thereof.''

Again we must consider appellant's contention and argument in the light of the real facts. We do not have here the situation of one corporation making a *bona fide* loan to another corporation and receiving therefor a note secured by a mortgage on real property and a sale of that note and mortgage by the mortgagee. Instead we find appellant Leach as the ''guiding hand'' of the Pacific Southwest Loan & Mortgage Corporation, having that corporation deliver from time to time as requested by him its notes and mortgages to his *''alter ego,''* the National Loan Company. The latter corporation at most cannot be said to be more independent of the Pacific Southwest Loan & Mortgage Corporation in these transactions than an agent for marketing the mortgage notes.

Appellant next complains that certain ''instructions on counts charging violation of the Corporate Securities Act were so confusing that the jury was misled thereby.''

We have given consideration to the instructions as a whole and conclude that the jurors were not misled by the instructions complained of. It is true that the words of the indictment are ''sell, authorize, and direct the sale'' (in reference to violations of the Corporate Securities Act), whereas the particular instruction complained of refers to an offense of *''issuing,''* but instructions numbers 52, 53, 54, 55 and 59, as given, made it clear to the jurors that no conviction for violation of the Corporate Securities Act could be had unless the jurors found the facts to be such that the sale to the National Loan Company was a mere gesture and that in reality the purported resale by the National Loan Company was a sale to the public by the Pacific Southwest Loan & Mortgage Corporation. The jurors, by their verdict, found this latter situation to exist and we do not see how they could have done otherwise under the evidence in the case. True, indeed, the jurors did acquit several defendants who, under the undisputed evidence in the case, apparently might have been convicted of violations of the Corporate Securities Act, but this miscarriage of justice, if any, as to others is of no benefit to appellant, nor does he claim any benefit therefrom except the general claim that the jurors felt that they had to

find someone guilty so they selected him through prejudice and not upon the evidence and the law.

It is not a necessary conclusion from the verdict that the Pacific Southwest Loan & Mortgage Corporation was found to have been merely a corporate cloak covering the person of appellant. Conceding appellant's contention that said corporation was in fact an entity separate and distinct from appellant, nevertheless, the evidence is sufficient to bring appellant within the provisions of section 31 of the Penal Code, which is as follows: "All persons concerned in the commission of a crime, . . . and whether they directly commit the act constituting the offense, or aid and abet in its commission, or, not being present, have advised and encouraged its commission, . . . are principals in any crime so committed."

As to count 39, which is one of the counts upon which appellant was convicted of a violation of the Corporate Securities Act, the securities alleged and proved to have been sold were mortgage notes issued by the South Coast Estates, Incorporated, as mortgagor, to First Mortgage Guaranty Company, of Los Angeles, as mortgagee, and sold and assigned to Mrs. Matilda Wiseman. Nothing is shown by the evidence as to either a lack of permit from the corporation commissioner or of a plan or system on the part of the corporations sufficient to constitute the mortgage notes "securities" within the purview of the Corporate Securities Act.

The judgments under counts 3, 5, 9, 11, 13, 21, 24, 28, 30, 33, 34, 35 and 36 should be affirmed, but as to count 39 of the judgment must be reversed.

As to the value of the land of the Pacific Southwest Loan & Mortgage Corporation at San Diego no purpose would be served by a recital of the testimony of the many witnesses both for the prosecution and for the defense. It will suffice, as to all counts under which convictions of grand theft were had (except count 38), to say that the testimony was conflicting to some extent, but every finding of low value of the land implied by the verdicts of the jury is fully sustained and supported by the evidence.

The transaction involved under count 2 of the indictment was an exchange of 11 mortgage notes of the face

value of $11,000 for 110 shares of preferred and 55 shares of common stock of Credit Finance Corporation.

The evidence is not sufficient to sustain the conviction under this count for the reason that there is a failure to prove the value of the stock of the Credit Finance Corporation. "The burden is upon the prosecution to show that the value of the property was in excess of $200 and, in the absence of such proof, a conviction of grand theft cannot be sustained" (*People* v. *Licalsi,* 99 Cal. App. 321 [278 Pac. 454]).

█ Under count 10 appellant was convicted of grand theft of 130 shares of stock of the North American Loan and Mortgage Company, of the alleged value of $13,000 and the personal property of Miss Benedicte Wrensted. Again the evidence is not sufficient to sustain the conviction. Nothing amounting to a false representation of facts is shown as either made by appellant or made by anyone else to his knowledge or through his instigation or assistance. The transaction was handled by H. L. Whitney and Clyde H. Walker as the "salesmen." Walker was acquitted by the jury's verdict and Whitney was not on trial.

█ Count 14 of the indictment charges the theft of 44 shares of the capital stock of the Southern California Edison Company of the value of $1500 and also a certain real estate mortgage of the value of $4,000, the personal property of Miss Mary King. Frank Hurlburt, a defendant who was acquitted upon the charge of theft contained in this count, was the "salesman" in this transaction. Miss King testified that on or about March 14, 1928, she was called by telephone by a man who said he was an official of the Pacific Southwest Mortgage Company, that she is now sure that the person then speaking was Mr. Leach as she has since heard his voice. The next day Hurlburt called upon her and said he was sent by an official of the Pacific Southwest Mortgage Company. She further testified that Hurlburt then told her, among other things, "we have mortgages and everything we give out and each mortgage represents from two to three times its value. We never take anything under that, so everyone that takes a mortgage from us gets a value of from two to three times its worth." She said further that Hurlburt said "that I need have no fear that

today if I had to sell that (the mortgage notes) I could get $15,000.00 for that.''

Since the report on values of these San Diego lots as made by Major John A. Griffin has an important part in this count it is necessary that we give some details concerning same. In June, 1927, on recommendation of his attorney, appellant hired Griffin for $300 and expenses to go to San Diego and report the values of the lots in the tract. Griffin testified, and his statements are not denied, that, ''I informed him (Leach), as I did his attorney, that my appraisal would in this case necessarily be a relative valuation; that is, I did not consider myself sufficiently expert on the actual values of property in San Diego to pass on their values—actual values—but by comparison, these properties with other properties, I could ascertain what these properties should be selling for, what they should be worth. . . . Q. That is, you told him that you would make an appraisal on the basis of the fact that the property was improved? A. Why, certainly. It was told me to be a high grade subdivision first class subdivision. Q. This is, with curbing and sidewalks? A. Yes. Q. Graded streets and gas and water and electricity on the tract. A. Yes. In fact it was to be exactly comparable with the tract that I went out and compared lots in.''

The gist of the matter is that Griffin, to Leach's knowledge, made a report on the values of lots in the tract upon the basis that the tract was completed as a first-class subdivision with all modern utilities at hand, including a completed highway through the tract, said highway being the then contemplated extension of Sixth Street northward across Mission Valley by the city of San Diego. We quote from his report as follows: ''The values of the individual lots or parcels in the contemplated subdivision of Montezuma Heights have been carefully gone into by me . . . in general I do not believe the following values will be materially disputed: 'That portion of the property lying westerly of Richardson Drive, from $750.00 to $800.00 per lot.

'' 'That portion between Richardson Drive and Whitney Drive, from $1,000.00 to $1,100.00 per lot.

'' 'That portion lying between Whitney Drive and Hoffman Drive, $1,200.00 per lot.

" 'That portion between Hoffman Drive and Birney, $1,500.00 per. lot.

" 'Balance of tract from $1,500.00 to $2,000.00 per lot.

" 'Qualification:

" 'The above reasoning and opinion is based on my general knowledge of San Diego and personal observation therein for a period of twenty-five years and my detailed experience in land valuations in the City of Los Angeles during the several years I was city engineer, and the last two years as a specialist on land valuations before the Superior Court of this County.'

" (Signed)   JOHN A. GRIFFIN."

Notwithstanding appellant's knowledge of the basis upon which above report was made he made use of the report as an appraisal by Griffin of the lots as they then stood. Having thus explained the said report we shall hereafter refer to it as "the Griffin report."

In preparing Hurlburt for calling upon "prospects," appellant supplied Hurlburt with various pieces of literature on the tract and its vicinity, including the Griffin report. Hurlburt in testifying denied that he made the statement of land value attributed to him by Miss King, except as he told her of the contents of said Griffin report and gave her a copy of same. He said "I told her that Major Griffin's report showed them to be worth an average of approximately three times the value of the mortgage placed upon them." "Q. Well, did you make any assertion of your own to that effect, without reference to Major Griffin's report? A. I did not. I knew nothing about it, outside of Major Griffin's report."

The evidence shows that appellant knew that said report was not a statement of the value of the lots as they then stood, that he gave out said report to his salesmen and to prospects with the intention that the prospects should be influenced thereby and be led to believe that the then present values of the lots were greater than they in fact were; that through both the report and Hurlburt in person the prospect Mary King was misled as to the value of the mortgage notes she received for the property she delivered to Hurlburt for appellant and which appellant received and accepted. People's exhibit 64 shows that Leach as president of the National Loan Company executed and acknowl-

edged the assignments of the mortgages to Miss King. Apparently Miss King first met Leach personally in the week following the transaction when she called to complain of the deal and to try to cancel same. Leach on this occasion told her, in substance, that the lots were worth two or three times the amount of the mortgage notes, and gave her another copy of the Griffin report.

All of the material elements of theft by appellant were established under this count and are sustained by the evidence. We next turn to the sufficiency of the evidence to sustain the verdict of *grand* theft. Appellant says there is no evidence of the value of the Southern California Edison Company stock or of the note and mortgage which Miss King delivered.

We have examined the record and find that appellant's contention is sustained thereby, except as the situation may be saved to the prosecution by section 492 of the Penal Code.

"If the thing stolen consists of any evidence of debt, or other written instrument, the amount of money due thereupon, or secured to be paid thereby and remaining unsatisfied, or which in any contingency might be collected thereon, . . . , is the value of the thing stolen." (Sec. 492, Pen. Code.) The evidence shows the note to be for the payment of $4,000 and interest. The evidence therefore as a matter of law supports the conviction of *grand* theft. (*State* v. *McCray*, 15 Okl. Cr. 374 [177 Pac. 127]; *People* v. *Cassill*, 71 Mont. 274 [229 Pac. 716]; *People* v. *Bogris*, 26 Idaho, 587 [144 Pac. 789]; *McDowell* v. *State*, 74 Miss. 373 [20 South. 864].)

Counts 15, 16 and 18 will be considered together. Count 15 charges the theft of four promissory notes, each in the sum of $2,500, and the personal property of Marion L. Vining and Cora M. Lane. Count 16 charges the theft of five promissory notes of the value of $2,500 each and one promissory note of the value of $5,000, and the personal property of Marion L. Vining and Cora M. Lane. Count 18 charges the theft on or about April 1, 1926, of a promissory note of the value of $2,500, and the personal property of Marion L. Vining and Cora M. Lane. John B. Dennis (originally one of the defendants, but as to whom all counts were dismissed on motion of the prosecuting attorney during the trial), first met the complaining witnesses Marion L. Vin-

ing and Cora M. Lane by calling upon them at the request of appellant to endeavor to get them to purchase an interest in the marketing of the land at San Diego. Dennis at first told them that it would be an interest in a ''syndicate'' for subdividing and marketing the tract, but they later closed the deal as a purchase of stock in the Pacific Southwest Loan & Mortgage Corporation. Claim is made by respondent that they were forced to accept stock although they had made a purchase only of units of a ''syndicate.'' The evidence does not sustain this claim, as it appears that they could have canceled the deal at any time up to their closing same on a basis of stock. The complaining witnesses are sisters and had substantial real estate holdings. They gave four promissory notes of $2,500 each (aggregating $10,000), payable to themselves and indorsed by them, for one-sixteenth of the then issued stock of the Pacific Southwest Loan & Mortgage Corporation. Appellant personally participated in the negotiations and closed the deal. The four notes are the notes referred to in count 15 and were dated March 26, 1926, and became due six months after date. Dennis testified that appellant ''Leach told me he was syndicating 320 acres on a basis of $500.00 an acre, or $160,000.00, and that he knew a couple of ladies (Marion L. Vining and Cora M. Lane) whom he would like to have me call upon.'' I told them ''that he was syndicating 320 acres of land on a basis of $160,000.00, or $500.00 an acre.''

Mrs. Vining testified that Dennis told them that Mr. Leach paid $500 an acre for it and that Mr. Leach personally told them that there were 320 acres and ''that he paid $500.00 an acre, making $160,000.00, of which we were to have 1/16; that is, 1/16 interest in it, and 1/16 interest in the profits. Q. And he had paid $500.00 an acre for the 320 acres, or $160,000.00. A. Yes, sir . . . '' and we ''believed him.''

Later on in the case she further testified: ''Q. Now then does that refresh your recollection to the effect that Mr. Leach did not at that time tell you that $500,00 or any other sum had been paid per acre for this land? A. Well someone told us. Either Mr. Leach or Mr. Dennis, I would not be sure which—I can say that it was one or the other of them.''

Appellant testified: "I said the 320 acres that the Pacific Southwest Loan and Mortgage Corporation acquired cost the company $500.00 an acre *in stock*."

On further examining of Dennis he testified: "I told them the land was syndicated and worth $500.00 per acre. Q. Did Mr. Leach tell you that? A. Yes, sir."

As is usual in a transaction of this kind we find the greater part of all the conversations was "salesman's talk" or "puffing." A few of such statements attributed to both Dennis and Leach were "that it was a wonderful thing, a wonderful chance to more than double "our money" and "there was a wonderful opportunity to make some quick money." The testimony bearing on count 15 is far too extensive to attempt to set it forth herein even in concise form. As indicated, however, by our foregoing statements, we are satisfied after a careful study of the whole record before us that appellant knowingly and intentionally led these women to believe that he was taking them into the proposition to the extent of one-sixteenth part of the whole on the same basis as the land was being acquired and that that basis was $500 per acre and that the land was reasonbly worth $500 per acre. From the evidence in the case, there can be no question of appellant's knowledge of the falsity of such representations. We are satisfied with the sufficiency of the evidence to sustain the conviction under count 15.

When the notes matured on or about September 26, 1926, Mrs. Vining and Miss Lane were unable to pay them without "embarrassment" in obtaining the cash at that time. Appellant had disposed of the notes shortly after receiving them and the then holders of the notes were pressing for payment. As a result of a conference between the two women, Leach and Dennis, the women signed six notes of $2,500 each and two notes of $5,000 each, an aggregate of $25,000. The testimony as to the exact purpose or purposes of the giving of these notes is conflicting. The women testified that to their understanding they signed only five notes of $2,500 each, of which four were to replace the four outstanding notes and the fifth was to be used to raise accrued interest and discounts, balance, if any, to be repaid to them, and two notes of $5,000 each which would be used only in the place of using the equivalent in smaller notes,

if convenience in placing the notes permitted their use; all notes not used were to be returned to them.

Dennis stated that $15,000 of the notes were to cover the outstanding notes, unpaid interest and discounts and that the remaining $10,000 in notes were for him (Dennis) to use to raise $4,000 in cash for payment by the women for an increase in their interest in a land subdivision in which he and one Whitney were interested, and in which latter subdivision Leach had no interest or connection with whatsoever. Leach's testimony is the same as Dennis' except that Leach stated that not being interested in Dennis' subdivision he gave no attention to that part of the conference and was in and out of the room at that time and does not know the details of that part of the conversation except that the $10,000 in notes were on the Dennis matter.

At the time the notes were given Leach and Dennis each took possession of three $2,500 notes and one $5,000 note. Appellant apparently did take up two of the outstanding notes, but the remaining two outstanding notes were not taken up until subsequently paid by a brother of the woman. Thereafter appellant delivered one $2,500 note and one $5,000 to his personal attorney with instructions to return the notes to the women when they paid for him $550 which he had expended in paying interest and discounts on the two notes which he had taken up. Dennis sold a $5,000 note for $3,500 and placed the remaining three $2,500 notes with Leach for sale. Leach made a sale of them for $4,500. It appears that of the $3,500 Dennis retained $1412.50 and gave $2,087.50 to Leach and that of the $4,500 Leach gave Dennis $987.50 and retained the balance. The $1412.50 and $987.50 aggregate $2,400 and Dennis testified that he obtained the balance of his expected $4,000, to wit, $1600 by accepting from Leach (some two months later) two $1,000 mortgage notes of the Pacific Southwest Loan & Mortgage Corporation. Apparently Leach claims to have gotten only "commission on $12,500.00 notes left with Dennis," but the record shows that he got $5,600 which is not explained by him.

As to count 16, our conclusion therefore is that the evidence is sufficient to sustain the conviction of grand theft.

As to count 18, we are wholly without even a semblance of assistance in respondent's brief. Appellant contends

that there is no evidence to sustain this conviction. After a full examination of the record we agree with appellant. It appears that plaintiff's exhibit No. 7 was intended as the note under this count, but said exhibit is a note for $2,500 given by Marion L. Vining and Cora M. Lane on or about May 29, 1926, to Dennis in connection with the Dennis-Whitney subdivision and appellant is not shown to have had any connection therewith.

Count 19 charged grand theft of $4,500 and count 20 charged grand theft of $1800 from Mrs. Celine Cugnier. As to both of these counts appellant's contention that the evidence is not sufficient to sustain the conviction of appellant must be sustained. The evidence fails to show any knowledge on the part of appellant of the criminal transactions, if any there were, of the "salesmen" George P. Wilson and Clyde H. Walker with Mrs. Cugnier. Undoubtedly, Mrs. Cugnier was the victim of someone and suffered a severe loss, but a conviction cannot stand on conjecture or surmise, it must be upon sufficient evidence.

Appellant was convicted under count 29 of the crime of grand theft. Without previous acquaintance with Mrs. Linnie Levens, appellant called upon her in the latter part of October, 1926, and offered her $97 per share for ten shares of the capital stock of the North American Bond and Mortgage Company. Mrs. Levens was the only one to testify as to the transaction had on this occasion. She said that she asked how he could afford to pay $97 per share for stock that was worth only $70 per share on the market and that he told her that he was working on a big deal and in this deal he could use her shares of stock to advantage and thereby he could afford to pay her more than the market; and that he said he would send her a check for $250 the next day and would pay her the balance as soon as the big deal was closed in about thirty or sixty days. She assigned and delivered the stock to him that evening. She received nothing until about November 6, 1926, when a man delivered to her a check for $70 and an unsecured note for $900 executed by the First Mortgage Securities Company. The note was dated November 6, 1926, and matured on November 15, 1926. Some time after January, 1927, the $900 note was surrendered by Mrs. Levens to one Clyde H. Walker in exchange for a $1,000 mortgage note of the

Pacific Southwest Loan & Mortgage Company. Walker had received the mortgage note from appellant for that purpose. Appellant contends that the transaction was merely a sale on credit. There is no evidence that any statement he may have made to her was false, unless we can say that the evidence is sufficient to show that at the time he told her he would send $250 the next day he had no intention of so doing and made the statement to induce her to part with her stock. However, it is not necessary that we herein declare upon that point, for the reason the statement by Mrs. Levens that he promised to send $250 the next day is not corroborated in any manner whatsoever. Hence the evidence in the case does not meet the requirements of section 1110 of the Penal Code and the conviction cannot be sustained.

The charge of grand theft of $10,000 contained in count 31 arose out of a transaction with Mrs. Ada E. Long (later by marriage Mrs. Ada E. Moreland). Ford Rieman (a defendant who testified voluntarily for the prosecution and as to whom the charge was dismissed at the request of the deputy district attorney) became acquainted with Mrs. Long and knew that she was considering placing a $10,000 mortgage upon her home for the purpose of investing the proceeds therefrom in stock. A chance meeting between Rieman and his friend Clarence A. Birney resulted in Rieman introducing Birney to Mrs. Long as a man who could handle her proposed mortgage. Birney was a defendant in this case but was acquitted by the jury. At the time of the transaction Birney was working for Leach, but Rieman, according to the record, knew nothing of the affairs of the Pacific Southwest Loan & Mortgage Corporation except what he was then told by Birney. In the presence of Rieman said Birney secured the $10,000 note and mortgage from Mrs. Long, payable to R. B. Moyer (then secretary of the said corporation) and delivered to her preferred stock of that corporation of the par value of $10,000. A recital of the details of the transaction will serve no purpose herein, hence we shall go directly to our conclusion after a study of the whole case. The evidence is insufficient to connect appellant with any criminal act, if any there was, in the transaction. Under the record in the case all that

appellant did prior to the conclusion of the deal was to approve the exchange and supply the stock for delivery to Mrs. Long. This conviction is not sustained by the evidence.

Under count 32 appellant was convicted of grand theft. Pacific Southwest Loan & Mortgage Corporation mortgage notes of the face value of $1,000 were given to Gertrude C. Griffin in exchange for a $1,000 Illinois Electric Light bond, about May 20, 1927. About one or two weeks later a further transaction was had wherein she gave a $1,000 Buenos Aires bond for a $1,000 mortgage note issued by the Pacific Southwest Loan & Mortgage Corporation. The "salesmen" in each transaction were Frank Cummings and George Fuller, neither of whom were on trial or testified at the trial. Gertrude C. Griffith was the sole witness as to the details of the transactions. She knew said Cummings and had been buying various stocks and bonds from him from time to time prior to the negotiations resulting in the transactions complained of. She testified that with Fuller said Cummings called upon her and "explained to me he had a better proposition that would pay 8 per cent and would be paid off sooner, and then he advised me to start on selling my stocks and bonds and buy this mortgage, which I did." She did not meet or have any dealings with appellant until several months thereafter when she called upon him in September, 1927. The statements appellant then made to her, according to her testimony, were representations of lot values and conditions as regards the San Diego land, wholly unwarranted by facts which are shown to have then been. known to appellant; but, his statements in September, 1927, could not have a causal connection with the transaction of May, 1927, and his said statements do not contain even a suggestion of an admission that he had had anything to do with or even knew of the sale of mortgage notes to Gertrude C. Griffith at the time of the sale. He may have assisted Cummings and Fuller or he may not have known a thing about the deal. The burden of proving the guilt of a defendant is on the prosecution. Conviction cannot rest on suspicion or surmise. We find nothing in the record to sustain this conviction under count 32.

Appellants Leach and Hurlburt were found guilty by the jury of grand theft under count 38. Both appellants personally participated in the transaction complained

of, although Hurlburt, as the "salesman," had most of the conversations with the complaining witness Mrs. Matilda Wiseman. The charge was grand theft of $2,000 in money and 12 units of Los Angeles Income Property stock of the value of $600. However, no money as such was involved; it was an exchange of real property and said stock for mortgage notes issued by the South Coast Estates, Incorporated, as mortgagor, to the First Mortgage Guaranty Company, of Los Angeles, as mortgagee.

Respondent contends that the transaction was theft by trick and device, but we are satisfied that if there was a theft it was by false pretenses and not by trick and device. The evidence shows clearly that Mrs. Wiseman intended at the time of transfer to part with both possession and title absolutely and not for a special purpose, such as to place upon a particular horse in a horse-race, to be used as a bribe or similar purposes commonly found in cases of larceny by trick and device. The intent to part absolutely and unconditionally with both possession and title prevents the transaction from being larceny by trick or device.

Proof of the falsity of the representations required proof as to the value of the mortgaged property. Appellant Hurlburt states in his brief that there is nothing in the whole case on this subject. The other briefs are silent as to this matter. We have found nothing thereon in the transcript. It is to be noted that the record does not show any connection whatever between the corporations named in this count and the Pacific Southwest Loan & Mortgage Corporation and the National Loan Company or either of them.

Mrs. Wiseman also testified that appellants promised when the deal was made, on or about February 6, 1928, that if she had to have some money they could advance her $500 by April 1, 1928, and that any time thereafter if she desired further money she could have it on request. Even if this be deemed a promise made without any intention of performing it, still there is no corroboration as required by section 1110 of the Penal Code.

The convictions under this count 38 cannot stand as to either appellant.

The orders denying the motions for new trial and the judgments under counts 2, 10, 18, 19, 20, 29, 31, 32, 38 and 39 are reversed and a new trial directed as to said counts.

The orders denying the motions for new trial and the judgments under counts 3, 5, 9, 11, 13, 14, 15, 16, 21, 24, 28, 30, 33, 34, 35 and 36 are affirmed.

Conrey P. J., and Houser, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on June 30, 1930.