BAYSHORE GARDENS, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 56654. Filed September 29, 1958.

*Samuel Byer, Esq.*, for the petitioner.

*Martin D. Cohen, Esq.*, and *William F. Chapman, Esq.*, for the respondent.

The respondent determined deficiencies in income tax in the amounts of $3,763.52 and $10,913.23 for the calendar years 1950 and 1951, respectively.

The parties have agreed to make automatic adjustments for an operating net loss carryover from 1950 to 1951 in the event the Court sustains petitioner on the remaining issue involved herein. That issue involves the correctness of respondent's determination that the sum of $43,407 received by petitioner in the year 1950 from the Lincoln Savings Bank of Brooklyn constitutes income fully taxable in that year. The bank loaned petitioner $1,335,600 for which petitioner executed to the bank its mortgage note in like amount, insured by the Federal Housing Administration, and the bank agreed to pay 3¾ per cent amounting to $50,085 over and above the principal amount of the mortgage note in order to obtain a desirable investment. Of this amount petitioner received the net sum of $43,407 in 1950. The questions presented are whether this amount represented, as respondent contends, the payment of some form of compensation or "finder's fee," or, as petitioner contends, constituted a premium and, if it was a premium, whether it is properly amortizable by petitioner over the 32-year 7-month term of the mortgage note.

### FINDINGS OF FACT.

The stipulated facts are so found. The stipulation and the joint exhibits attached thereto are incorporated herein by this reference.

The petitioner is a New York corporation having its principal place of business at 616 Caton Avenue, Brooklyn, New York. Petitioner kept its books and records and reported its income on an accrual calendar year basis. Its Federal tax returns for the years involved were filed with the then collector of internal revenue for the first district of New York.

The petitioner's certificate of incorporation filed on May 31, 1949, *inter alia*, authorized it to acquire real property and provide housing for rent or sale; to borrow money and issue evidences of indebtedness secured by mortgage, deed of trust, pledge or other lien; and to obtain from the Federal Housing Commissioner contracts of mortgage insurance pursuant to the provisions of the National Housing Act, as amended, covering bonds, notes, and other evidences of indebtedness issued by the corporation, and any indenture of mortgage or deed of trust securing the same. Since incorporation petitioner has engaged in the business of constructing and operating a rental-housing project.

The petitioner's original authorized capital stock consisted of 100

shares of no-par-value common stock and 100 shares of $1-par-value preferred stock. The 100 shares of common stock were originally issued on August 11, 1949, in equal amounts to Hyman H. Zarett and Sylvia Lane, as consideration for their conveyance to petitioner of land in which those individuals had a basis of $31,479.59 and an equity of $3,946.41. Of the latter amount, $3,500 was treated on petitioner's books as paid in for stock and $446.41 as capital surplus.

On October 27, 1949, Sylvia Lane transferred all of her stock, and Hyman H. Zarett transferred 16⅔ shares to Jack Spiegel and Isidore Lehrer, each of whom contributed $3,500 to petitioner's capital. Thereafter, Zarett, Spiegel, and Lehrer each owned 33⅓ shares of petitioner's common stock and, at all times here material, those three men were the directors, Zarett was president, and Lehrer was vice president, treasurer, and secretary of petitioner. On October 27, 1949, petitioner's 100 shares of preferred stock were issued to the Federal Housing Commissioner who paid $100 in cash therefor to petitioner.

During the period material herein, Thomas C. Grady was an individual doing business as Thomas C. Grady Company (sometimes hereinafter referred to as Grady), with offices located in Jamaica, New York. Grady's principal business was to act as broker in arranging and processing mortgage loans insured by the Federal Housing Administration (hereinafter referred to as the F. H. A.) pursuant to section 608 of the National Housing Act. Grady was familiar with the regulations, forms, and procedures involved in processing F. H. A.-insured mortgage loans.

In the latter part of 1948 Zarett, as sponsor for the proposed mortgagor, Bayshore Gardens, Inc., contacted Grady and orally engaged him to act as broker to obtain a satisfactory F. H. A.-insured mortgage loan and to process all the required papers. For such services Grady was to receive compensation in the sum of 1 per cent of the principal amount of the mortgage loan obtained. The oral agreement was reduced to writing on or about February 23, 1949, as hereinafter mentioned.

As a result of conversations prior to January 7, 1949, between Zarett and Grady on the one hand, and on the other hand between Grady and officers of the Lincoln Savings Bank of Brooklyn (hereinafter referred to as Lincoln), Grady attempted to arrange a mortgage loan subject to F. H. A. mortgage insurance for the purpose of financing the proposed construction of an apartment house on Cass Place, Brooklyn, New York. As a result of those conversations and, also, negotiations between Grady, Lincoln, Zarett, and F. H. A., an "Application for Mortgage Insurance Under Section 608 of the National Housing Act" was submitted to F. H. A. on January 7, 1949, by Lincoln as the proposed mortgagee and by Zarett as sponsor for

the proposed mortgagor, Bayshore Gardens, Inc. The application was for a building and permanent loan in the principal amount of $1,400,000 at 4 per cent interest per annum. The application directed that correspondence with the proposed mortgagor be addressed to Thomas C. Grady Company. The proposed apartment house construction project was assigned Project No. 012–42145 by F. H. A.

In the latter part of January 1949 Grady advised Zarett that Lincoln would pay a 3¾ per cent premium on the mortgage and Zarett instructed Grady to accept on behalf of the sponsor for Bayshore Gardens, Inc.

In a letter dated February 8, 1949, addressed to Thomas C. Grady Company, Lincoln made a commitment for a fully insured F. H. A. construction and permanent loan of $1,400,400 to be made on the bond of Bayshore Apartments, Inc., approved by the Federal Housing Commissioner as an eligible mortgagor. The letter stated that the commitment was made subject to numerous conditions and requirements to be complied with by the borrower, and set forth the term of the loan for 32 years 7 months after completion of the apartment building, the various costs and fees to be paid by the borrower, and other matters. The letter, "[i]n consideration of the premium to be paid by the Bank," set forth a prepayment penalty clause in the event the mortgage indebtedness was paid prior to the agreed-upon due date or dates. The concluding paragraph of the letter stated that "[t]his letter will become effective upon receipt by us of the enclosed copy hereof signed by the proposed mortgagor within fifteen days after the date hereof"; and in compliance therewith the copy was signed "Accepted and approved—Thomas C. Grady for the sponsor" and returned to Lincoln.

The hereinabove or hereinafter use of the names Bayshore Gardens, Inc., or Bayshore Apartments, Inc., refer to one and the same proposed mortgagor.

In making loans on mortgage notes, Lincoln generally insists on the inclusion therein of prepayment penalty clauses irrespective of whether it discounts the note, pays a premium thereon, or pays either a commission or finder's fee in respect thereto. At times Lincoln has paid commissions or finder's fees to persons who brought certain types of mortgage loan business to the bank, but it never made such payments in connection with obtaining mortgage loans pursuant to section 608 of the National Housing Act.

Under date of February 8, 1949, Lincoln sent a letter addressed to Thomas C. Grady Company which stated, in part, that in connection with the above-mentioned commitment, dated February 8, 1949, "it is hereby agreed that we will pay to your company a premium of 3¾% on the fully insured FHA loan."

The above-mentioned oral agreement in the latter part of 1948, between Zarett and Grady for the services of the latter to act as a broker, was reduced to writing on or about February 23, 1949. On that date a letter from Grady addressed to Bayshore Gardens, Inc., % Mr. Hyman H. Zarett, set forth the terms of the agreement between those parties which were approved and accepted by Zarett as sponsor for Bayshore Gardens, Inc. The letter referred to and enclosed a copy of Lincoln's commitment letter of February 8, 1949, and stated in part as follows:

The Lincoln Savings Bank has further agreed in connection with this mortgage loan to pay us a premium of 3¾% of the mortgage loan. This premium shall be forwarded to you upon receipt thereof, subject to the conditions hereinafter stated.

It is understood and agreed that you will pay to the undersigned 1% of the mortgage loan for services rendered by the undersigned, which amount shall be paid in installments, as follows: * * * [50 per cent upon the execution of the mortgage and 25 per cent at each of two subsequent times].

\* \* \* \* \* \* \*

It is understood and agreed that our services shall include the services customarily performed by a processing broker in this type of transaction * * *.

\* \* \* \* \* \* \*

We enclose herewith an additional copy of this letter, which you will please execute at the foot thereof and return to this office, in acceptance of this commitment and in acknowledgment of and agreement with the terms and conditions of our employment as set forth in this letter.

The minutes of meetings of Lincoln's finance committee reflect its actions with respect to the application of Bayshore Gardens, Inc., for an F. H. A.-insured mortgage loan and show, *inter alia*, under date of February 9, 1949, after a description of the proposed mortgage loan, "To be purchased at 103¾%. Bank to service. Broker— Thomas C. Grady Co."; under date of September 14, 1949, after stating that the F. H. A. had granted an extension on its commitment, the committee voted to leave further negotiations to the mortgage officers and, further, "it was recommended to pursue an arrangement for payment of the premium in three annual installments, if possible"; and under date of January 4, 1950, that the committee "Ratified Approval" of a $1,335,600 mortgage loan to Bayshore Gardens, Inc., "Loan to run for 32 yrs. 7 months, 5½% constant, payable monthly, 4% to interest, and balance to reduction of principal. F. H. A. 608 Loan—Pchsed. at 103¾%. Bank to Service."

In agreeing to make an F. H. A.-insured mortgage loan to Bayshore Gardens, Inc., in the face amount of $1,335,600 to be repaid in accordance with the terms of the loan and in addition to pay a so-called premium of 3¾ per cent or the sum of $50,085, Lincoln

was influenced by several factors. Such factors included, *inter alia*, the market price for mortgage money at that time which governed the yields obtainable on mortgages and the fact that during 1949 and 1950 savings institutions were paying premiums to obtain F. H. A. 608 loans; the security back of the mortgage; the yield or interest rate, vis-a-vis, the cost of the mortgage; the reputation of the builder; the income-producing prospects of the proposed building; and the prepayment penalty clause designed to discourage prepayment of the loan at an early date.

On May 13, 1949, the F. H. A. issued a "Commitment for Insurance" in an amount not to exceed $1,335,600 on Project No. 012–42145 to Lincoln as mortgagee and Zarett as sponsor for Bayshore Gardens, Inc., mortgagor.

On October 27, 1949, a "Building Loan Agreement" on F. H. A. Form 2441–W was executed by Lincoln and petitioner.

On October 27, 1949, petitioner executed and issued to Lincoln an F. H. A.-insured mortgage note in the principal amount of $1,335,600 with interest at the rate of 4 per cent per annum, and a mortgage to secure payment thereof with interest alone to December 1, 1950, and beginning January 1, 1951, in specified monthly installments of principal and interest, with any remaining unpaid balance plus accrued interest due and payable on July 1, 1983. The penalty clause provision contained in the mortgage note used the term "adjusted premium charge" to be paid the bank in the event of prepayment of the loan.

On October 27, 1949, Lincoln and petitioner executed an agreement whereby the former agreed to accept petitioner's corporate note on F. H. A. form as the credit instrument "in place of the usual form of corporate bond," for the purpose of avoiding the purchase of United States documentary tax stamps to be affixed to such corporate bond. Further, petitioner agreed to deposit $1,469.16 to be held in escrow by Lincoln until petitioner obtained a ruling from the Commissioner of Internal Revenue as to whether the corporate note was taxable under certain provisions of the Internal Revenue Code. On December 13, 1949, the Commissioner of Internal Revenue issued a ruling that petitioner's mortgage note "executed under the circumstances and subject to the conditions set forth therein does not come within the class of corporate securities subject to the tax imposed by section 1801 of the Internal Revenue Code."

On December 29, 1950, Lincoln and petitioner executed F. H. A. Form 2023–W, whereby Lincoln declared that the construction project had been completed and petitioner acknowledged receipt of the mortgage loan in the amount of $1,335,600.

On December 27, 1950, Thomas C. Grady Company executed an instrument whereby it assigned to petitioner the sum of $43,407 "of

the total commissions to be paid to the said assignor" by Lincoln "in accordance with a commitment issued to the assignor in connection with the placing of a mortgage loan" on petitioner's premises in the amount of $1,335,600, and further stated, *inter alia*, that the "within assignment is subject to all the terms and conditions of the agreement between the assignor" and Lincoln "for the payment of said commis· sions."

On December 29, 1950, Lincoln issued two checks, one payable to Bayshore Gardens, Inc., in the amount of $43,407 and the other payable to Thomas C. Grady Company in the amount of $6,678. On the same date Thomas C. Grady Company issued to Lincoln a receipt describing those two checks and stating that "THE TOTAL OF THE ABOVE TWO CHECKS REPRESENTS THE THREE AND THREE-QUARTER (3¾%) PER CENT PREMIUM DUE ON THE FHA 608 DEVELOPMENT KNOWN AS BAYSHORE GARDENS, INCORPORATED."

On December 29, 1950, petitioner issued its check payable to Thomas C. Grady Company in the amount of $6,678. That check, together with Lincoln's check in the same amount, totaled $13,356, which amounted to the sum of 1 per cent of the mortgage loan petitioner had agreed to pay Grady for services rendered as broker in processing the F. H. A.-insured mortgage loan.

In the foregoing transactions Lincoln did not engage or retain the services of Thomas C. Grady Company but instead accepted and dealt with the latter as agent and broker for the proposed mortgagor, Bayshore Gardens, Inc. The amount of the so-called premium which Lincoln agreed to pay to obtain the F. H. A.-insured mortgage loan on petitioner's premises was due to the mortgagor. The Thomas C. Grady Company was entitled to receive the $50,085 premium payment only as the broker for the mortgagor, petitioner herein. Lincoln required the execution of the above-mentioned assignment and receipt for its own protection to cover its issuance of the check made payable to petitioner, which check was actually received by Grady and turned over to petitioner. On Lincoln's books the payment of $50,085 was treated as a premium subject to amortization.

Lincoln's check dated December 29, 1950, in the amount of $43,407 payable to the order of petitioner, was received by petitioner on December 29, 1950, without any restriction or limitation on the use thereof and was deposited by petitioner to its own account on the same date. On December 29, 1950, petitioner made cash distributions to its three stockholders in the amounts of $34,987.90 to Zarett, $34,023.33 to Lehrer, and $34,023.33 to Spiegel, or a total of $103,-034.56. Petitioner reported an operating loss of $27,421.05 on its Federal tax return for the taxable year ended December 31, 1950.

Petitioner's check dated December 29, 1950, in the amount of $6,678 payable to the order of Thomas C. Grady Company, was recorded

on petitioner's books as a disbursement entered as a debit to the account headed "Misc. Prepaid Expenses—Mortgage Expenses."

The premium, the mortgage expenses, and the amortized portion of the premium were recorded on the petitioner's books in the following manner for the indicated years:

| Date | PREPAID MORTGAGE PREMIUM | |
| | Debit | Credit |
| --- | --- | --- |
| December 29, 1950 | | $43,407.00 |
| December 31, 1950 | $30,502.76 | |
| December 31, 1951 | 397.08 | |
| December 31, 1952 | 397.08 | |
| December 31, 1953 | 397.08 | |
| December 31, 1954 | 397.08 | |
| December 31, 1955 | 397.08 | |
| December 31, 1956 | 397.08 | |

| Date | MISC. PREPAID EXPENSES MORTGAGE EXPENSES | |
| | Debit | Credit |
| --- | --- | --- |
| November 2, 1949 | $2,896.80 | |
| October 31, 1949 | 20,167.50 | |
| May 11, 1950 | 643.26 | |
| December 29, 1950 | 103.00 | |
| December 29, 1950 | 6,678.00 | |
| December 31, 1950 | 14.20 | $30,502.76 |
| Totals | $30,502.76 | $30,502.76 |

| Date | MISCELLANEOUS FINANCIAL INCOME MORTGAGE PREMIUM EARNED |
| | Credit |
| --- | --- |
| December 31, 1951 | $397.08 |
| December 31, 1952 | 397.08 |
| December 31, 1953 | 397.08 |
| December 31, 1954 | 397.08 |
| December 31, 1955 | 397.08 |
| December 31, 1956 | 397.08 |

For Federal income tax, as well as internal accounting purposes, petitioner offset the amount of $43,407 received from Lincoln on December 29, 1950, by the amount of $30,502.76 shown as "mortgage expense" in the next preceding paragraph. The difference, $12,904.24, was carried as "Mortgage Premium Deferred" under "Liabilities" as at December 31, 1950, on petitioner's 1950 return. An aliquot part of the amount of $12,904.24 based on the term of the mortgage and mortgage note was reported as income in the amount of $397.08 on petitioner's Federal income tax return for 1951.

In determining the deficiency involved herein for the calendar year 1950, the respondent, *inter alia*, included as additional income the amount of $43,407 as a commission with the explanation that "[i]t is held that the sum of $43,407.00 received in the taxable year 1950 from the Lincoln Savings Bank constitutes income taxable in that year."

The parties are agreed that the mortgage expenses incurred by petitioner incident to the issuance of its mortgage note are capital expenditures deductible on a pro rata basis over the term of the mortgage.

OPINION.

KERN, *Judge:* We shall first consider the question as to the character of the amount of $50,085 which the Lincoln Savings Bank agreed to pay over and above the principal amount of petitioner's F. H. A.-insured mortgage note in order to obtain a desirable investment.

Respondent takes the position that Lincoln did not make a payment of $50,085 (or the amount of $43,407 here in controversy) on December 29, 1950, which was due to petitioner as a "premium" as that term is generally understood in the field of corporate finance and as contended by petitioner herein. Respondent contends that such amount was payable by Lincoln to Grady as a commission or finder's fee and that Grady assigned $43,407 thereof to petitioner.

In support of his contention respondent relies particularly on the language used in the letter dated February 8, 1949, from Lincoln to Grady wherein the bank stated that in connection with its commitment for the mortgage loan to petitioner "it is hereby agreed that we will pay to your company a premium of 3¾% on the fully insured FHA loan" and, also, Grady's December 27, 1950, assignment to petitioner of $43,407 "of the total commissions to be paid to the said assignor."

Further, in the alternative, respondent contends that the amount of $43,407 received by petitioner from Lincoln on December 29, 1950, represented compensation paid by Lincoln to petitioner for services rendered by petitioner's employees and agents in obtaining approval for an F. H. A.-insured mortgage loan.

There are some conflicts in the terms or language used in some of the various instruments in evidence but, in our opinion, the record as a whole clearly establishes the obvious intent of the parties and the ultimate effect of their actions. The record establishes that Zarett, as sponsor for petitioner, employed the services of Grady as a broker for an agreed compensation amounting to 1 per cent of the F. H. A.-insured mortgage loan obtained for the petitioner and that Lincoln never retained the services of Grady but dealt with him only as the agent and broker representing the proposed mortgagor. Further, the record is clear that Lincoln, in order to obtain an attractive investment, agreed to pay a sum equal to 3¾ per cent over and above the principal amount of the mortgage loan as a premium which was due the mortgagor.

Contrary to respondent's contention, we conclude and so hold that the amount of $43,407 here in controversy was not part of a commis-

sion or finder's fee, payable by Lincoln to Grady for his services and in turn assigned by Grady to petitioner, and, further, that such amount was not compensation paid by Lincoln to petitioner for services rendered.

Based upon the entire record, including all the documentary evidence and testimony, we hold that the $50,085 Lincoln agreed to pay to the mortgagor for its F. H. A.-insured mortgage loan was the amount by which the proceeds of the mortgage loan to the mortgagor exceeded the principal amount of the note secured by the mortgage and, as such, constituted a "premium" as that word is commonly understood.

The next question presented is whether the mortgagor, petitioner herein, may properly amortize the mortgage premium over the term of the mortgage note.

Such a premium constitutes taxable income to the mortgagor. *Fall River Electric Light Co.*, 23 B. T. A. 168. Since in the instant case the taxpayer received in 1950 $43,407 of such premium[1] subject to its unfettered use and control, it would be subject to income tax in that year on the entire amount received unless under statute or valid regulation of the Commissioner the taxpayer may amortize this receipt of premium over the term of the mortgage note. *Old Colony R. Co.* v. *Commissioner*, 284 U. S. 552.

The only statutory provisions upon which petitioner relies in his argument that the premium may be amortized over the term of the note are sections 41 and 42 (a) of the Internal Revenue Code of 1939, set out in the margin.[2] The generality of the language appearing in these statutory provisions is apparent and is emphasized by considering in contrast the specific character of the provisions of section 125 of the Code relating to the *deduction* of amortizable bond premiums

---

[1] The respondent makes no contention that the entire amount of the premium is taxable to petitioner, even though that part not actually received by petitioner was paid to Grady in satisfaction of an obligation owed by petitioner to him.

[2] SEC. 41. GENERAL RULE.

The net income shall be computed upon the basis of the taxpayer's annual accounting period (fiscal year or calendar year, as the case may be) in accordance with the method of accounting regularly employed in keeping the books of such taxpayer; but if no such method of accounting has been so employed, or if the method employed does not clearly reflect the income, the computation shall be made in accordance with such method as in the opinion of the Commissioner does clearly reflect the income. If the taxpayer's annual accounting period is other than a fiscal year as defined in section 48 or if the taxpayer has no annual accounting period or does not keep books, the net income shall be computed on the basis of the calendar year.

SEC. 42. PERIOD IN WHICH ITEMS OF GROSS INCOME INCLUDED.

(a) GENERAL RULE.—The amount of all items of gross income shall be included in the gross income for the taxable year in which received by the taxpayer, unless, under methods of accounting permitted under section 41, any such amounts are to be properly accounted for as of a different period. In the case of the death of a taxpayer whose net income is computed upon the basis of the accrual method of accounting, amounts (except amounts includible in computing a partner's net income under section 182) accrued only by reason of the death of the taxpayer shall not be included in computing net income for the period in which falls the date of the taxpayer's death.

including the definition of the term "bond" as used in that section.[3] Respondent's regulations covering sections 41 and 42 make no reference to any problem relating to the receipt of premiums but reiterate the general rule set out in section 42 to the effect that "gains, profits, and income are to be included in the gross income for the taxable year in which they are received by the taxpayer, unless they are included as of a different period in accordance with the approved method of accounting followed by him." Regs. 111. sec. 29.42–1. The "approved method of accounting followed by" petitioner was stipulated to be on an accrual basis.

We find nothing in the general language of sections 41 and 42 (a) which would permit or authorize the amortization of the premium here in question.

Petitioner also relies in his argument upon a regulation of respondent (Regs. 111, sec. 29.22 (a)–17 (2) (*a*))[4] which does specifically refer to the amortization of a premium by its recipient, but this regulation by its terms is applicable only to a situation where "*bonds* are *issued* by a corporation at a premium." (Emphasis supplied.) It is part of a subsection (sec. 29.22 (a)–17) entitled "Sale and Purchase by Corporation of Its Bonds." That the term "bond" is not used in a sense embracing all evidences of indebtedness is indicated by the existence of section 29.22 (a)–13 of the same regulations, which deals with the "cancellation of indebtedness" and "the payment or purchase of * * * obligations at less than their face value." The fact that the deduction of amortizable bond premiums as we have pointed out, is limited to premiums on bonds, as defined in section 125 (d) of the Code, is another indication that section 29.22 (a)–17 (2) (*a*) was intended to be limited to corporate bonds and not to embrace other evidences of indebtedness.

For purposes of statutory construction, the word "bond" appearing by itself is not considered as including other forms of indebtedness and specifically not to include a mortgage note. *Algonquin Electric Co.*, 36 F. 2d 603 (S. D. N. Y. 1929); *People* v. *Leach*, 106 Cal. App. 442, 290 Pac. 131. See also *Union & Planters Bank & Trust Co.* v. *Fort*, 170 Tenn. 285, 95 S. W. 2d 39.

---

[3] SEC. 125. AMORTIZABLE BOND PREMIUM.

(d) DEFINITION OF BOND.—As used in this section, the term "bond" means any bond, debenture, note, or certificate or other evidence of indebtedness, issued by any corporation and bearing interest (including any like obligation issued by a government or political subdivision thereof), with interest coupons or in registered form, but does not include any such obligation which constitutes stock in trade of the taxpayer or any such obligation of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or any such obligation held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business.

[4] SEC. 29.22 (a)–17. SALE AND PURCHASE BY CORPORATION OF ITS BONDS.

(2) (*a*) If, subsequent to February 28, 1913, bonds are issued by a corporation at a premium, the net amount of such premium is gain or income which should be prorated or amortized over the life of the bonds.

It may be pointed out that petitioner itself recognized the difference taxwise between a bond and a mortgage note by its insistence that it execute the mortgage note rather than issue its bond.

We conclude that there is no provision of the Internal Revenue Code and no pertinent regulation of the Commissioner which would authorize the petitioner to amortize the premium received by it upon the execution of its mortgage note.

It may be that accounting theories having to do with premiums, as related to "real interest," might warrant some statutory provision or regulation granting the same treatment to premiums received on the execution of mortgage notes as to premiums received on the issuance of corporate bonds (see *Old Colony R. Co.* v. *Commissioner, supra*), but there are none now available to petitioner.[5]  Absent such provisions, we conclude that the premium received by petitioner constituted taxable income to it in the year when it was received.

*Decision will be entered for the respondent.*

---

[5] It may be speculated that a premium received upon the execution of a mortgage note was a rarity until the advent of mortgages insured by the Federal Housing Administration.