[Crim. No. 24252. Apr. 7, 1986.]

THE PEOPLE, Plaintiff and Respondent, v.
JOSEPH C. FIGUEROA et al., Defendants and Appellants.

**COUNSEL**

Mark D. Greenberg and Manuel E. Nestle, under appointments by the Supreme Court, for Defendants and Appellants.

John K. Van de Kamp, Attorney General, Edward P. O'Brien, Assistant Attorney General, Derald E. Granberg and Robert R. Granucci, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**BIRD, C. J.**—The principal question presented by this appeal is whether the trial court, in a prosecution for the sale of unqualified securities, erred

in instructing the jury that certain "Corporation Promissory Notes" were "securities" within the meaning of the Corporate Securities Law. (Corp. Code, § 25000 et seq.[1])

## I.

Joseph and Dennis Figueroa appeal from a judgment of conviction for one count of selling unqualified securities. (§§ 25110, 25540.) The jury deadlocked on thirteen additional counts, eight alleged against Joseph and five against Dennis. Thereafter, a mistrial was declared on those counts, and they were dismissed with the understanding that they could be considered by the court for restitution purposes. Both appellants were given terms of probation with conditions including restitution, a suspended county jail term, and community service.

Only the facts relating to the count on which appellants were convicted are relevant to this appeal.

In mid-March of 1979, Arlo Kurrle responded to an advertisement which had appeared in the San Jose Mercury News. The ad stated "Solar & Energy Business. Partner wanted with $7,000 or more. Active or nonactive." Kurrle called one of the two phone numbers listed in the ad and spoke to Joseph Figueroa, who described an existing insulation business and his desire to expand into solar energy.

Kurrle met Joseph and his son, Dennis, the following day. The Figueroas told Kurrle about Figueroa Insulation & Energy Co., Inc. (Insulation) of which Dennis was president. The new solar energy business would also be a corporation. Kurrle learned about two other businesses, Figueroa Financial Insurance Services, Inc. (Insurance) and Figueroa Business & Financial Consultants (Financial).

Joseph and Dennis proposed that Kurrle invest $10,000 in their business. The money was to be used for the purchase of insulation equipment and the installation of telephones used to solicit loan customers.

At the first meeting, Kurrle and Joseph discussed whether Kurrle was to be active in the business. Kurrle expressed interest in having a direct role, possibly in the sales or management areas.

A few days later, Kurrle called Joseph and agreed to lend the company $10,000. There was no discussion about what form Kurrle's investment

---

[1]All further statutory references are to the Corporations Code unless otherwise indicated.

would take, but Kurrle "was thinking in terms of a loan . . . that would be documented." During the conversation, Joseph told Kurrle that he would be an officer in one of the Figueroa corporations.

Over the next four weeks, Kurrle paid the money to the Figueroas in five separate installments evidenced by five 2-year notes.[2] The notes were to earn 10 percent interest annually. Kurrle had the option to take payment in cash or shares of the company. The fourth loan installment, for $2,500, constituted the basis for the charge on which the Figueroas were eventually convicted.[3] Kurrle made that loan by giving the Figueroas a check payable to Dennis. The loan was witnessed by a "Corporation Promissory Note" from Insulation which was signed by Dennis. In relevant part it stated:

"April 27th, 1979
#### CORPORATION PROMISSAROY [sic] NOTE
$2,500.00
FOR THE VALUE RECEIVED, ON OR BEFORE 24 months after date, without grace The Figueroa Insulation & Energy Company, Inc., promises to pay to the order of Mr. Arlo Kurrle, of San Jose, California or at his home or office. [¶] The sum of $2,500 two thousand dollars & Five Hundred at the rate of 10% per Cent annum until paid. . . . [¶] . . . Its [sic] agreed and understood, that this corporation note is all due an [sic] payable in 24 months from date of this note and its [sic] further agreed and understood, that *interest* is to be paid annual [sic] each year, but all due and payable April 27th, 1981. . . ."

Kurrle began working in the Figueroa office sometime in early April, shortly after making the first loan installment. He was made secretary/treasurer of Financial and Insulation and worked primarily for Joseph and Financial, updating loan source lists and contacting potential lenders. He also accompanied Dennis on sales calls for Insulation and developed a demonstration kit used by Dennis in his presentations. Kurrle stayed with the business for about four months. Although the trial testimony does not indicate whether he was ever repaid, the probation report and restitution order strongly suggest that he was not.

## II.

The first claim raised by appellants is that the trial court committed reversible error by failing to specify in its instructions what burden of proof

---

[2] It is not clear in which of the companies Kurrle believed he was investing.

[3] Four of the additional charges against Joseph and three of the additional charges against Dennis involved loans made by Kurrle. The remaining charges involved limited partnership purchases by other investors.

must be met to establish that the sale was exempted from qualification. Since Justice King's opinion in the Court of Appeal correctly analyzes and resolves this issue, this court adopts that part of his opinion as its own.

It is noteworthy that the Attorney General concedes that the Court of Appeal's resolution of this issue is correct and that the judgment of conviction must be reversed on this basis. With appropriate deletions and additions,* that analysis follows:

[Section 25110 makes it unlawful "for any person to offer or sell in this state any security in an issuer transaction . . . unless such sale has been qualified under section 25111, 25112 or 25113 . . . *or unless such security or transaction is exempted under Chapter 1 (commencing with Section 25100) of this part.*" (Italics added.) Sections 25100 through 25105 specify securities and transactions which are exempted from qualification under the Corporate Securities Law. The statute upon which appellants relied was section 25102, subdivision (e), which exempts from the provisions of section 25110 "[a]ny offer or sale of any evidence of indebtedness, whether secured or unsecured, and any guarantee thereof, in a transaction *not involving any public offering.*" (Italics added.)]

[¶] Section 25163 provides "[i]n any proceeding under [the Corporate Securities Law], the burden of proving an exemption or an exception from a definition is upon the person claiming it." Since appellants claimed they came within a private offering exemption to section 25110, they bore the burden of proving [that fact]. (See *People* v. *Park* (1978) 87 Cal.App.3d 550, 566-567 [151 Cal.Rptr. 146] [state did not bear burden of proving lack of private offering exemption in prosecution under section 25110]; *People* v. *Murphy* (1936) 17 Cal.App.2d 575, 585-586 [62 P.2d 592].) Joseph's proposed instruction therefore was partially erroneous, as it placed the burden on the state to disprove any exemptions.[4] [The trial court properly placed] this burden of proof on the Figueroas, but [did] not define the quantum or degree of that burden.

---

*Brackets together, in this manner [], are used to indicate deletions from the opinion of the Court of Appeal; brackets enclosing material (other than the editor's parallel citations) are, unless otherwise indicated, used to denote insertions or additions by this court. (*Conservatorship of Early* (1983) 35 Cal.3d 244, 247 [197 Cal.Rptr. 539, 673 P.2d 209].)

[4Joseph's proposed instruction stated in relevant part: [¶] "the defendants have asserted that they were exempted from such qualification with the Commissioner of Corporations because of the [']private exemption['] offering. [¶] In this regard, you are instructed that if the proved circumstances or evidence raise a reasonable doubt that registration was required by law, then you must give the defendant or defendants the benefit of that doubt and acquit him/them of those charges. In view of the defense raised, *before you can convict any defendant of any charge of offering and selling securities without a permit, the evidence must show beyond a reasonable doubt that such offers and sales were not exempted.*" [(Italics added.)]

■ The court is required to instruct the jury on both the assignment *and the magnitude* of burdens of proof. (Evid. Code, § 502.) Section 502 presents four degrees of burdens of proof: "that a party raise a reasonable doubt concerning the existence or nonexistence of a fact or that he establish the existence or nonexistence of a fact by a preponderance of the evidence, by clear and convincing proof[,] or by proof beyond a reasonable doubt." Evidence Code section 501 provides "[i]nsofar as any statute, except section 522, assigns the burden of proof in a criminal action, such statute is subject to Penal Code section 1096."[5] The Law Revision Commission comment on Evidence Code section 501 notes that "where a statute allocates the burden of proof to the defendant on any [issue other than insanity] relating to the defendant's guilt, the defendant's burden . . . is merely to raise a reasonable doubt as to his guilt."

The issue of the defendant's precise burden of proving he or she comes within an exemption to the securities registration law is one of first impression in California.[6] In *People* v. *Tewksbury* (1976) 15 Cal.3d 953 [127 Cal.Rptr. 135, 544 P.2d 1335], [this] court discussed the degrees of burdens of proof which may be placed on a defendant in a criminal case. (3) "[W]hen there is placed upon an accused the burden of interjecting a factual contention which, if established would tend to overcome or negate proof of any element of the crime charged as otherwise established by the People, the accused need only raise a reasonable doubt as to the existence or nonexistence of the fact in issue." (*Id.,* at p. 963.) Examples of such instances include unconsciousness and alibi defenses. ([*Ibid.*]) On the other hand, defendants may be required to prove by a preponderance of the evidence defenses "which raise factual issues collateral to the question of the accused's guilt or innocence and do not bear directly on any link in the chain of proof of any element of the crime." (*Id.,* at p. 964.) Among such instances are entrapment defenses and challenges to testimony as being hearsay or that of an accomplice. (*Id.,* at pp. 964-968.)

[5]Evidence Code section 522 places the burden of proof on the defendant to prove his insanity by a preponderance of the evidence. Penal Code section 1096 states the presumption of innocence and the prosecution's burden of proving guilt beyond a reasonable doubt.

[6]Several cases from other jurisdictions require defendants to prove their presence within an exemption by a preponderance of the evidence. (See *State* v. *Goetz* (N.D. 1981) 312 N.W.2d 1, 9-10; *United States* v. *Tehan* (6th Cir. 1966) 365 F.2d 191, 194-196, cert. den. (1967) 385 U.S. 1012 [17 L.Ed.2d 548, 87 S.Ct. 716].) These cases do not explain the choice of that degree of burden of proof. Other cases require a lesser degree of proof. (See *Commonwealth* v. *David* (1974) 365 Mass. 47 [309 N.E.2d 484, 488] [an exemption defense "requires the defendant to satisfy a burden of production of evidence before the Commonwealth must meet its burden of persuasion."][.]) The State of Ohio amended its securities statute to clearly set its burden of proof. (See *State* v. *Frost* (1979) 57 Ohio St.2d 121 [387 N.E.2d 235, 237[,] fn. 1 [Ohio Rev[.] Code, § 2901.05(A) was amended to read "[t]he burden of going forward with the evidence of an affirmative defense, and the burden of proof, by a preponderance of the evidence, for an affirmative defense is upon the accused." (Italics omitted)][.])

■ Jefferson's Evidence Benchbook makes a similar distinction on the defendant's burden of proof. "On any issue of defendant's guilt that is in the nature of an affirmative defense, the burden of proof assigned to defendant shall be merely to raise a reasonable doubt as to his guilt; . . . [o]n a guilt issue other than whether defendant committed the criminal acts charged, the burden of proof assigned to defendant may be fixed at proof by a preponderance of the evidence." (2 Jefferson, Cal. Evidence Benchbook (2d ed. 1982) § 45.1, p. 1640.)

■ An exemption defense to a prosecution under the state securities law is an affirmative defense which is not "collateral" to the defendant's guilt. Unless the Legislature provides otherwise, the defendant's burden of proof is merely to raise a reasonable doubt that the offering did not require registration. Here the trial court erred by refusing to instruct on this degree of the defendants' burden of proof.[7]

The court's error was compounded by its instruction which said "[i]t is unlawful for any person to offer or sell in this state any security unless such sale has been qualified or *unless such security has been exempted with the California Corporations Commissioner.*" (Italics added.) This instruction [gave] the erroneous impression that the Figueroas had to apply for and receive a formal exemption from the Corporations Commissioner.

The jury deliberated two days and deadlocked on three related charges [involving Kurrle] where the only defense [permitted to go to the jury] was a private offering exemption.[8] During deliberations, the jury requested copies of the instructions on exemptions. This was a close case and it is reasonably probable that a result more favorable to the defendants would have occurred had appropriate instructions been given. (See *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) [End of excerpt from Court of Appeal opinion.] As the Attorney General concedes, reversal of the conviction is required on this basis.

---

[7The prosecutor's closing argument did nothing to clarify the specific burden of proof required. During her comments, she noted only that "this whole issue of a private exemption, that burden falls on the defense. It is their burden *to establish and prove to you* that there's a private offer, an exemption to them in this case . . . . [¶] . . . Did the defendants prove . . . that a private offering exists?"]

[8Appellants' principal claim was that although Kurrle was initially attracted to the businesses through an ad in the newspaper, the actual offer and sale of securities—if indeed the notes were securities—was made and accepted *after* Kurrle started working for the company. The jury was given a list of several factors to consider in deciding this question.]

## III.

 The principal question presented in this case is whether the trial court erred in instructing the jury that the promissory notes involved in the Kurrle transactions were "securities" under the Corporate Securities Law.[9]

At trial, the defense offered evidence, some of which was admitted and some of which was excluded, on the question of whether securities were involved in the Kurrle transactions. (See *post*, at p. 740.) The defense also proffered an instruction which purported to guide the jury in determining this question. That instruction was refused.

Over defense objection, the trial court charged the jury that "the promissory notes received by Arlo Kurrle are securities as defined in section 25019 of the Corporate Securities Act." The trial court did not read the section 25019 definition to the jury, nor did it elucidate further on the meaning of the term. Ironically, this instruction followed one which told the jury that one of the elements the prosecution had to prove beyond a reasonable doubt was whether "a security in an issuer transaction" was involved in the section 25110 counts.[10]

The district attorney relied fully on the court's charge. During the first of her two closing arguments, she stated: "With respect to the issue of securities. *Again, that's another issue that's going to be taken out of your hands.* You don't have to make the determination about whether those limited partnerships involved in counts one, two and three in Figueroa Diversified Investments was a security or not. His honor is going to instruct you that as

---

[9]With exceptions not here relevant, the text of section 25019 in effect at the time of the Kurrle transactions provided: "'Security' means any note; stock; treasury stock; membership in an incorporated or unincorporated association; bond; debenture; evidence of indebtedness; certificate of interest or participation in any profit-sharing agreement; collateral trust certificate; preorganization certificate or subscription; transferable share; investment contract; voting trust certificate; certificate of deposit for a security; certificate of interest or participation in an oil, gas or mining title or lease or in payments out of production under such a title or lease; any beneficial interest or other security issued in connection with a funded employees' pension, profit sharing, stock bonus, or similar benefit plan; or, in general, any interest or instrument commonly known as a 'security'; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing. All of the foregoing are securities whether or not evidenced by a written document. . . ."

[10]That instruction stated: "As to each count of the information, the state must prove that the individual charged in that particular count did the following: [¶] One, offered and sold; [¶] *Two, a security in an issuer transaction;* [¶] Three, without a permit from the commissioner of corporations; [¶] Four, that the charged individual did those acts willfully. [¶] *Each* of these elements of the charge *must be proved* beyond a reasonable doubt as to the specific individual charged in that count, before the jury can return a verdict of guilty." (Italics added.)

a matter of law those are securities. [¶] His honor will also instruct you that the limited partnerships involved in counts four and five . . . are securities. But that's another matter that's not within your purview, you don't have to decide that, it's been decided for you. [¶] *With respect to counts six, seven, eight and nine the promissory notes that were received by Mr. Kurrle, his honor will also instruct you that those are securities, as a matter of law. The law says and you have to accept it.*"

The precise issue raised by the trial court's actions is whether the giving of the challenged instruction was tantamount to a directed verdict on the "security" element of the offense.

■ It has long been recognized that a trial judge "may not direct a verdict of guilty no matter how conclusive the evidence." (*Brotherhood of Carpenters* v. *United States* (1947) 330 U.S. 395, 408 [91 L.Ed. 973, 985, 67 S.Ct. 775]; accord *United States* v. *Martin Linen Supply Co.* (1977) 430 U.S. 564, 572-573 [51 L.Ed.2d 642, 651-652, 97 S.Ct. 1349]; *Sparf and Hansen* v. *United States* (1895) 156 U.S. 51, 105 [39 L.Ed. 343, 362, 15 S.Ct. 273]; cf. *Sandstrom* v. *Montana* (1979) 442 U.S. 510, 524 [61 L.Ed.2d 39, 51, 99 S.Ct. 2450]; *Bollenbach* v. *United States* (1946) 326 U.S. 607, 615 [90 L.Ed. 350, 355-356, 66 S.Ct. 402].) Only recently, a plurality of the Supreme Court reaffirmed this principle, observing that "[t]he Court consistently has held that 'a trial judge is prohibited from entering a judgment of conviction or directing the jury to come forward with such a verdict . . . regardless of how overwhelmingly the evidence may point in that direction.'" (*Connecticut* v. *Johnson* (1983) 460 U.S. 73, 84 [74 L.Ed.2d 823, 832, 103 S.Ct. 969], quoting *Martin Linen Supply, supra,* 430 U.S. at pp. 572-573 [51 L.Ed.2d at p. 652].)

The prohibition against directed verdicts "includes perforce situations in which the judge's instructions fall short of directing a guilty verdict but which nevertheless have the effect of so doing by eliminating other relevant considerations if the jury finds one fact to be true." (*United States* v. *Hayward* (D.C. Cir. 1969) 420 F.2d 142, 144.) As one panel of the Fifth Circuit has stated, "[N]o fact, not even an undisputed fact, may be determined by the judge." (*Roe* v. *United States* (5th Cir. 1961) 287 F.2d 435, 440, cert. den. (1961) 368 U.S. 824 [7 L.Ed.2d 29, 82 S.Ct. 43]; accord *United States* v. *Musgrave* (5th Cir. 1971) 444 F.2d 755, 762.)

*Johnson* and *Sandstrom* illustrate these principles well. In *Sandstrom* the jury was instructed that "'[t]he law presumes that a person intends the ordinary consequences of his voluntary acts.'" (442 U.S. at p. 517 [61 L.Ed.2d at p. 46].) The court held, by a seven-to-two vote, that the jurors "could reasonably have concluded that they were directed to find against

defendant on the element of intent." (442 U.S. at p. 523 [61 L.Ed.2d at p. 50].)

In *Johnson* the instruction was that "'every person is conclusively presumed to intend the natural and necessary consequences of his act.'" (460 U.S. at p. 78 [74 L.Ed.2d at p. 829].) The high court unanimously condemned this instruction as error of constitutional magnitude. Four justices expressed the view that it was the "functional equivalent of a directed verdict" on the issue of intent (460 U.S. at p. 84 [74 L.Ed.2d at p. 832] (plur. opn.)), while four others believed that any instruction which "remove[d] an issue completely from the jury's consideration" would require reversal (*id.,* at p. 95 [74 L.Ed.2d at p. 839] (dis. opn.)).[11] This court has read *Johnson* as standing for the proposition "that at least eight justices of the United States Supreme Court . . . agree that a jury instruction which . . . take[s] an issue completely from the jury" is reversible error. (*People* v. *Garcia* (1984) 36 Cal.3d 539, 554.)

The rule prohibiting verdicts directed against an accused emanates from the guarantee of due process and the right to a jury trial. Due process "protects the accused against conviction except upon proof beyond a reasonable doubt of *every fact* necessary to constitute the crime with which he is charged" (*In re Winship* (1970) 397 U.S. 358, 364 [25 L.Ed.2d 368, 375, 90 S.Ct. 1068]). It requires the state to prove "'every ingredient of an offense beyond a reasonable doubt . . . .'" (*Sandstrom* v. *Montana, supra,* 442 U.S. at p. 524 [61 L.Ed.2d at p. 51], quoting *Patterson* v. *New York* (1977) 432 U.S. 197, 215 [53 L.Ed.2d 281, 295, 97 S.Ct. 2319].)

The right to a jury trial reflects the framers' "fundamental decision about the exercise of official power—a reluctance to entrust plenary powers over the life and liberty of the citizen to one judge or to a group of judges." (*Duncan* v. *Louisiana* (1968) 391 U.S. 145, 156 [20 L.Ed.2d 491, 500, 88 S.Ct. 1444].) As Chief Judge Aldrich of the First Circuit has observed, "the jury, as the conscience of the community, must be permitted to look at more than logic. . . . If it were otherwise there would be no more reason why a verdict should not be directed against a defendant in a criminal case than in a civil one. The constitutional guarantees of due process and trial by jury require that a criminal defendant be afforded the full protection of

---

[11]The division in *Johnson* was on the standard for assessing the prejudicial effect of the instructional error. (*Id.,* at pp. 87-88 [74 L.Ed.2d at pp. 834-835] (plur. opn.); 90-99 [74 L.Ed.2d at pp. 836-842] (dis. opn.).) Justice Stevens, who would have cast the tie-breaking vote on that question, believed it unnecessary to address the issue because the prosecutor's request that the Connecticut Supreme Court declare the error harmless "does not even raise a federal question." (*Id.,* at p. 89 [74 L.Ed.2d at p. 836].) He nevertheless joined the plurality's disposition which affirmed the Connecticut court's reversal of the conviction. (*Id.,* at pp. 89-90 [74 L.Ed.2d at pp. 836-837].)

a jury unfettered, directly or indirectly. [Citation.]" (*United States* v. *Spock* (1st Cir. 1969) 416 F.2d 165, 182; see also *Cabaña* v. *Bullock* (1986) 474 U.S. —, — [88 L.Ed.2d 704, 715, 106 S.Ct. 689, 696]: "[A] jury's verdict cannot stand if the instructions provided the jury do not require it to find each element of the crime under the proper standard of proof, [citation]. Findings made by a judge cannot cure deficiencies in the jury's finding as to the guilt or innocence of a defendant resulting from the court's failure to instruct it to find an element of the crime. [Citation.]")[12]

The California cases are generally in accord with these explanations. For example, in *People* v. *Shavers* (1969) 269 Cal.App.2d 886 [75 Cal.Rptr. 334], the court found reversible error in an instruction which charged that if the jury found the accused guilty of robbery "it is robbery in the first degree." (*Id.*, at p. 888.) "Where a plea of not guilty has been entered, the trial judge may not direct a verdict of guilty even though the prosecution's case is strong and the defense does not present a substantial evidentiary case. [Citation.] The judge may *comment* on the evidence [citation] but may not *instruct* the jury that as a matter of law some element of the crime charged has been adequately proved." (*Id.*, at pp. 888-889, italics in original.)[13]

This court, relying on the foregoing United States Supreme Court authority, has also condemned procedural devices which are analogous to a directed verdict. (See, e.g., *People* v. *Garcia, supra,* 36 Cal.3d at p. 551 [failure to instruct on element of intent]; cf. *People* v. *Roder* (1983) 33 Cal.3d 491, 496 [189 Cal.Rptr. 501, 658 P.2d 1302] [instruction on presumption of guilty knowledge in receiving stolen property prosecution].) As the *Garcia* court observed, "[t]he reasoning of the [high court] opinions . . . would invalidate any instruction . . . which would permit the state to circumvent the requirement that it prove every fact necessary for conviction

---

[12]Other courts have explained that the directed verdict prohibition arises out of the jury's absolute power to acquit the accused. In such instances, "the judge, no matter how contrary to the evidence he may think the verdict is, cannot set it aside . . . . [S]ince the judge is without power to review and overturn a verdict of not guilty, there is no basis on which to claim the power to direct a verdict of guilty." (*Konda* v. *United States* (7th Cir. 1908) 166 Fed. 91, 93; accord *Sparf and Hansen* v. *United States, supra,* 156 U.S. at p. 106 [39 L.Ed. at pp. 362-363].)

[13]Several similar statements are found in this court's cases involving the court's power to comment on the evidence. (Cal. Const., art. VI, § 10.) In *People* v. *Dail* (1943) 22 Cal.2d 642, 658 [140 P.2d 828], this court noted that "[t]he trial court, under the guise of comment, may not properly control the verdicts by a direction either directly or *impliedly* made." (Italics in original; accord *People* v. *Cook* (1983) 33 Cal.3d 400, 408 [189 Cal.Rptr. 159, 658 P.2d 86]; *People* v. *Brock* (1967) 66 Cal.2d 645, 650 [58 Cal.Rptr. 321, 426 P.2d 889], overruled in part on other grounds in *Cook, supra,* 33 Cal.3d at p. 413, fn. 13; *People* v. *De Moss* (1935) 4 Cal.2d 469, 477 [50 P.2d 1031]; *People* v. *Ottey* (1936) 5 Cal.2d 714, 728-729 [56 P.2d 193].)

beyond a reasonable doubt. [Citation]." (36 Cal.3d at p. 551; cf. *People* v. *Miller* (1962) 57 Cal.2d 821, 828 [22 Cal.Rptr. 465, 372 P.2d 297] [error to instruct that "evidence in this case" is such that defendant is either guilty of first degree murder or innocent altogether since such an instruction removes possibility of conviction on lesser included offenses].)

Cases from the federal circuits are more numerous on the subject. Two cases involving federal securities violations hold that it is error to charge the jury that a particular instrument is a "security" within the meaning of the federal securities laws.[14] (*United States* v. *Johnson* (5th Cir. 1983 (en banc)) 718 F.2d 1317; *Roe* v. *United States, supra,* 287 F.2d at p. 440 ["[A]s a matter of law, the evidence of these transactions, if credited, would constitute the sale or delivery of an 'investment contract,' hence a 'security' . . . . But the if in 'if credited' is a big one. By its very nature, it is the peculiar facts of the setting which turns the offer from a mere sale of property into a sale of a security. That means that the trier of fact . . . must determine the issue. . . ."].)[15]

*United States* v. *Johnson, supra,* 718 F.2d 1317, is particularly instructive not only because it contains an extensive discussion of the issue, but because it is an en banc decision which was preceded by an opinion by a three-judge panel which had reached a contrary result. (700 F.2d 163, rehg. granted 700 F.2d at p. 181.) For these reasons, it is discussed in some detail.

---

[14]The definition of "security" under federal law (15 U.S.C. § 77b(1); 18 U.S.C. § 2311) served as the model for the definition in Corporations Code section 25019 (*ante,* fn. 9). (Marsh & Volk, Practice Under the Cal. Corporate Securities Law of 1968 (1969) ch. 5, § 16, p. 178, and Draftsmen's Commentary to § 25000 et seq., Appen. A, p. 512.) As such, decisions interpreting the federal definition are helpful in resolving issues presented under the state law. (*Hamilton Jewelers* v. *Department of Corporations* (1974) 37 Cal.App.3d 330, 333 [112 Cal.Rptr. 387].)

[15]At least one sister state court has reached a similar conclusion, relying heavily on a lengthy quotation from *Roe.* (*Miller* v. *State* (Fla.App. 1973) 285 So.2d 41, 42; see also *Hentzner* v. *State* (Alaska 1980) 613 P.2d 821, 829 [suggestion that on retrial issue should be determined by jury].)

Research has disclosed one federal decision which holds to the contrary. (*United States* v. *Fishbein* (9th Cir. 1971) 446 F.2d 1201, 1207, overruled on other grounds in *United States* v. *De Bright* (9th Cir. 1984 (en banc)) 730 F.2d 1255.) The court's holding is based on a one-sentence statement that there was no factual issue as to whether certain stock was a security. (446 F.2d at p. 1207.)

Finally, it is unclear on which side of the fence *United States* v. *Austin* (10th Cir. 1972) 462 F.2d 724, cert. den. (1972) 409 U.S. 1048, lies. That case involved an instruction which included the term "letter of commitment" in the definition of a "security" and charged that if the jurors found a particular letter of commitment existed, it was to be considered a "security" within the meaning of the federal statute. The court held that the giving of the instruction was "not reversible error" (*id.,* at p. 736) but cautioned that it was "not to be understood as approving action of a trial court in failing to go through the motions at least of submitting the issue to the jury even though the question appears . . . to be palpably lacking in factual character." (*Id.,* at p. 737.)

Johnson was a trader in precious metals who was rehired by his former employer for the purpose of resuscitating a failing company. Johnson's primary task was to demonstrate to company auditors that the company was solvent so that a public stock offering could be made. To this end, he travelled to Dallas and obtained a "Gold Certificate Contract" from a businessman contact. The certificate purported to assign Johnson and the company a substantial quantity of gold. Johnson returned to California with the certificate and presented it to company auditors. They were unable to verify the existence of the gold represented in the contract. Shortly thereafter, the company declared bankruptcy. Johnson was subsequently charged with, inter alia, the interstate transportation of a falsely made security knowing it was not authentic. (18 U.S.C. § 2314.)

One of Johnson's defenses was that the certificate was not a "security" within the meaning of the federal statute. The trial court nevertheless refused an instruction defining the term and instructed the jury that the gold contract was a "security." The jury found Johnson guilty.

The court of appeals reversed. It held that the trial judge "was no more entitled to refuse to allow the jury to decide whether the Gold Certificate was a security than he would have been permitted to refuse to charge on whether the Certificate was falsely made or whether Johnson acted knowingly. Knowledge that the Gold Certificate was false or forged was, of course, also an essential element of the crime. But submission of this element to the jury does not excuse the failure to submit a different element: whether, regardless of Johnson's subjective belief or knowledge, the Gold Certificate was a security." (*Johnson, supra*, 718 F.2d at p. 1323.)

Although *Johnson* was a case in which the "security" element of the charge was hotly contested, the court frankly acknowledged the necessity of submitting that question to the jury even when it was not seriously open to dispute. "[W]hether a tangible document or thing meets a statutory definition . . . depends upon the probative value of evidence *even when the evidence seems so clear as to leave no room for fool's questions.*" (*Id.*, at p. 1324, italics added.)[16]

---

[16]Judge Albin's majority opinion was joined in by seven other circuit judges. Judge Garwood, concurring specially, opined that the instruction was error because the gold contract was "vague and ambiguous" as to whether it fit the definition of a security under the federal statute. While he would have condemned an instruction which completely removed the issue from the jury, he would have permitted a carefully worded one which in essence only commented on the evidence. (718 F.2d at pp. 1325-1326.)

Judge Williams's dissent, joined in by three other judges, would have upheld the instruction as within the province of the court's power to decide questions of law. "[A]s long as the judge need not weigh the probative value of evidence to make his decision, it is proper for the judge to determine whether or not an item is a security as a matter of law." (*Id.*, at

Several other circuit court decisions hold that it is error to instruct the jury that an essential element of the offense has been established.[17] On the other hand, as the *Johnson* majority frankly conceded (718 F.2d at p. 1323, fn. 17), there is also a substantial body of federal authority to the contrary.[18]

---

p. 1329.) In his view, the only factual question was whether the accused *knew* that the instrument was a security. (*Ibid.*)

The dissent also relied on several cases (see *id.*, at pp. 1330-1333) which purportedly "illustrate the established principle that a judge has the right to rule on a matter of law in a criminal case, even if that matter of law concerns an element of the offense." (*Id.*, at p. 1334.) With all due respect, these cases involve, for the most part, the issue of whether the *evidence was sufficient* to establish that a "security" was involved. Only one—*United States* v. *Fishbein* (see *ante*, fn. 15)—involved an instruction resolving the issue for the jury.

[17]Examples include instructions charging the jury that the accused violated one of two gasoline price fixing rules (*United States* v. *Heller* (T.E.C.A. 1980) 635 F.2d 848, 856-857); that a statement to a governmental agency was "material" (*United States* v. *Valdez* (9th Cir. 1979) 594 F.2d 725, 729); that a particular loan was a "loanshark loan" (*United States* v. *Benedetto* (3d Cir. 1977) 558 F.2d 171, 176-177); that activities of a particular paid informant could be disregarded in assessing an entrapment defense (*United States* v. *Sheldon* (5th Cir. 1976) 544 F.2d 213, 219-221); that the evidence showed attempted robbery as a matter of law (*Mims* v. *United States* (5th Cir. 1967) 375 F.2d 135, 147-149); that a particular firearm was subject to registration (*Bryan* v. *United States* (5th Cir. 1967) 373 F.2d 403, 407); that certain assessments made by the Internal Revenue Service against the accused were valid (*United States* v. *England* (7th Cir. 1965) 347 F.2d 425, 429-436); that a "pop bottle" was a dangerous weapon (*Greenfield* v. *United States* (D.C.Cir. 1964) 341 F.2d 411, 412-413); that the accused's failure to pay a "wagering tax" was "undisputed" (*DeCecco* v. *United States* (1st Cir. 1964) 338 F.2d 797, 798); and that a particular vehicle had moved in interstate commerce (*United States* v. *Gollin* (3d Cir. 1948) 166 F.2d 123, 125-126; accord *Schwachter* v. *United States* (6th Cir. 1956) 237 F.2d 640, 644). (See also *United States* v. *Goetz* (11th Cir. 1984) 746 F.2d 705, 707-708 [instruction that tax forms filed with Internal Revenue Service were not "forms"]; *United States* v. *Hayward, supra*, 420 F.2d at pp. 143-144; *Brown* v. *United States* (9th Cir. 1964) 334 F.2d 488, 498-501 (conc. opn. of Duniway, J.), affd. on other grounds (1965) 381 U.S. 437 [instruction that a particular union executive board is an "executive board or similar governing body" under Labor-Management and Reporting Act]; *United States* v. *McKenzie* (6th Cir. 1962) 301 F.2d 880, 881-882 [instructions that only issue was the identification of the accused]; *United States* v. *Manuszak* (3d Cir. 1956) 234 F.2d 421, 424-425 [instructions conveyed message that theft was implicitly or explicitly established]; *United States* v. *Raub* (7th Cir. 1949) 177 F.2d 312, 315-316 [instructions assumed true issues of falsity and fraud in income tax evasion case]; see generally cases cited in *United States* v. *England, supra*, 347 F.2d at p. 433, fn. 12.)

In many of these cases the appellate court reversed the conviction irrespective of the lack of any evidentiary conflict on the issue covered by the erroneous instruction.

[18]Thus, courts have upheld instructions charging that a particular declaration or statement is a "material" one in prosecutions for making a materially false customs declaration (*United States* v. *Ackerman* (5th Cir. 1983) 704 F.2d 1344) or a materially false statement to a governmental agency (*Sinclair* v. *United States* (1927) 279 U.S. 263 [73 L.Ed. 692, 49 S.Ct. 268], but see *United States* v. *Hausmann* (5th Cir. 1983) 711 F.2d 615 [questioning correctness of *Sinclair*]; *United States* v. *Adler* (8th Cir. 1980) 623 F.2d 1287, 1292 & fn. 8 [expressing view jury should be so instructed]); that certain Federal Reserve notes were "obligations of the United States" in a counterfeiting prosecution (*United States* v. *Guy* (8th Cir. 1972) 456 F.2d 1157, 1163); that an escapee's custody constituted "federal custody" under the federal escape statute (*United States* v. *Morris* (8th Cir. 1971) 451 F.2d 969); that certain property was "property of the United States" or "government property" in prosecutions for damaging or stealing government property (*United States* v. *Briddle* (8th Cir.

The latter cases appear to rely on one or both of the following two premises: (1) that the evidence at trial leaves little doubt as to whether a particular element of the offense has been established, and (2) that the challenged instruction is within the trial court's province because the issue that it resolves is purely a question of law. The Attorney General maintains that either of these premises justifies an instruction like the one given here.

The first premise is clearly unsupportable. If a judge were permitted to instruct the jury on the basis of assertedly "undisputed" evidence that a particular element had been established as a matter of law, the right to a jury trial would become a hollow guarantee. As the court in *Konda* v. *United States, supra,* 166 Fed. at page 93 observed, "an accused person has the same right to have 12 laymen pronounce upon the truth or falsity of each material averment in the indictment, if the evidence against him is clear and uncontradicted, as he unquestionably would have if it were doubtful and conflicting. Inasmuch as jurors are rightly trusted, in close and difficult cases, to maintain the peace and dignity of organized society, surely they may be relied on in the plain and simple ones."

As to the second premise, the distinction between questions of law and questions of fact, Judge Rubin's comments in *Johnson* are fitting: "This distinction is at best elusive. There is no categorical distinction between 'legal' and 'factual' questions, for in every case application of a legal principle turns on the presence of particular facts. A contemporary author has aptly explained why the 'law' and 'fact' distinction misses the mark in criminal trials.

" 'There is considerable misunderstanding in the minds of the general public regarding provisions making a jury the judge of fact and not of law. This misunderstanding is attributable in large part to the inaccuracy of the general rule that juries decide *only* the facts. This is an inaccurate expression because it leaves the impression that juries are not judges of the law at any time or in any sense. Juries are always judges of the law in the sense that juries must pass on the manner and the extent in which the law expounded by the judge fits the facts brought out in the evidence. This process requires juries to perform the legal function of interpretation and application. In the absence of express authority, however, juries are not judges of the law in determining what principle of law is applicable to the evidence.'

1971) 443 F.2d 443, 447-448; *United States* v. *Jackson* (9th Cir. 1970) 436 F.2d 39, 41-42); that a warehouse was "bonded" in a prosecution for removal of property from "bonded area" within governmental control (*United States* v. *Parisi* (6th Cir. 1966) 365 F.2d 601, 605, vacated on other grounds *sub nom. O'Brien* v. *United States* (1967) 386 U.S. 345 [18 L.Ed.2d 94, 87 S.Ct. 1158]); and that a certain apparatus constituted a "still" in a prosecution for unlawfully setting up a still (*Guy* v. *United States* (4th Cir. 1964) 336 F.2d 595, 597).

[¶] S. McCart, Trial by Jury 116-17 (1965) (emphasis in original). *Hence, although attempting to separate 'fact' from 'law' may sometimes be useful, particularly when a statute or a federal rule turns on the differentiation, it is not the issue here. The issue is the role of the jury in the trial guaranteed to the accused.*" (718 F.2d at p. 1321, second italics added, fns. omitted.)

The Attorney General, seizing on this "law/fact" distinction, points to a "lengthy and settled" body of case law which assertedly holds that the question of what constitutes a security is one of law reserved exclusively to the trial court. (See *People* v. *Skelton* (1980) 109 Cal.App.3d 691, 712-713 [167 Cal.Rptr. 636], cert. den. (1981) 450 U.S. 917 [67 L.Ed.2d 343, 101 S.Ct. 1361]; *People* v. *Miller* (1961) 192 Cal.App.2d 414, 418 [13 Cal.Rptr. 260]; *People* v. *Rankin* (1959) 169 Cal.App.2d 150, 160 [337 P.2d 182], cert. den. (1960) 362 U.S. 905 [4 L.Ed.2d 556, 80 S.Ct. 616]; *People* v. *Marvin* (1941) 48 Cal.App.2d 180, 193 [119 P.2d 413]; *People* v. *Dutton* (1940) 41 Cal.App.2d 866, 872-873 [107 P.2d 937]; *People* v. *Rubens* (1936) 11 Cal.App.2d 576, 587 [54 P.2d 98]; *People* v. *McCalla* (1923) 63 Cal.App. 783, 789 [220 P. 436], disapproved on other grounds in *People* v. *Elliot* (1960) 54 Cal.2d 498, 503 [6 Cal.Rptr. 753; 354 P.2d 225], but see *People* v. *Pompa-Ortiz* (1980) 27 Cal.3d 519 [165 Cal.Rptr. 851, 612 P.2d 941] [*Elliot* disapproved]; *S.E.C.* v. *Howey Co.* (1946) 328 U.S. 293, 299-300 [90 L.Ed. 1244, 1249-1250, 66 S.Ct. 1100, 163 A.L.R. 1043].) However, only four cases, *McCalla, Dutton, Marvin* and *Skelton,* squarely hold that the court may instruct the jury that a particular instrument is a security within the meaning of the state corporate securities laws.[19] Moreover, as will become apparent, none of these holdings withstands scrutiny under more modern concepts of due process and the right to a jury trial.

The origins of the holding appear in *McCalla.* There, the appellant argued that the trial court erroneously prevented him from demonstrating that his counsel had advised him that an investment certificate issued to an investor

---

[19]In both *Miller* and *Rankin* the lower court proceedings were tried before a judge sitting as a trier of fact. (*Miller, supra,* 192 Cal.App.2d at p. 415; *Rankin, supra,* 169 Cal.App.2d at p. 153.) Thus, no instructional errors were at issue.

In *Rubens* the issue was whether the trial court properly *refused* defense instructions stating that certain classes of instruments were *not* securities. (11 Cal.App.2d at pp. 585-586.) Although the appellate court noted that the trial court "was authorized to determine as a matter of law and to instruct the jury regarding the legal effect of the terms of the challenged 'option to purchase oil and gas lease assignment'" (*id.,* at p. 587), it was careful to point out that "*[t]he court did not do so.* It was very cautious, very clear and very fair in instructing the jury regarding the effect of the instruments which are involved on this appeal." (*Ibid.,* italics added.)

*Howey* involved a civil proceeding brought by the Securities and Exchange Commission to restrain the sale of investment contracts involving shares in a citrus grove business. No instruction of the kind challenged here was involved.

was not a "security" within the meaning of the Corporate Securities Act. The appellate court rejected this argument, adhering to the rule that ignorance of the law is no excuse. (63 Cal.App. at pp. 793-796.) In so doing, the court approved the trial court's instruction that the certificate was a "security" within the meaning of the state securities law. The court cited no authority for its conclusion and did not appear to recognize the constitutional implications of its holding.[20]

*Dutton* came 17 years after *McCalla*, but failed to fill the analytic void. There, the court recognized that the instruction withdrew "from the jury the question as to whether certain documents introduced into evidence were securities" (41 Cal.App.2d at p. 872), but found no error in view of the state constitutional provision permitting the court to "instruct the jury on the law applicable to the facts of the case." (Former art. VI, § 19, repealed Nov. 8, 1966.) "In view of the definition of the term 'security' as set forth in section 2 of the Corporate Securities Act, there can be no doubt that as a matter of law the people's exhibits in question constituted securities and the court was authorized to so advise the jury." (41 Cal.App.2d at p. 873.)

One year later came *Marvin*. It followed closely in *McCalla*'s and *Dutton*'s wake, making no waves of its own. It also failed to analyze the question in any great detail. Noting only that there was no dispute that the documents involved came within the "security" definition, the Court of Appeal concluded that "[i]t was therefore within the province of the trial court to instruct the jury that the documents . . . constituted securities as a matter of law." (48 Cal.App.2d at p. 193.)

Though it came nearly four decades after *Marvin, Skelton* merely repeated the "rules" which its predecessors had enunciated. Relying on *Dutton* and on the principle that whether a particular document is a security is to be determined on a case-by-case basis (*People* v. *Syde* (1951) 37 Cal.2d 765, 768 [235 P.2d 601]), the court held that there had been no error in the giving of such an instruction. (109 Cal.App.3d at pp. 713-714.)

Inexplicably, none of these cases addressed the due process and jury trial rights which are arguably violated by such an instruction. That omission is

---

[20]The entirety of the court's "analysis" is as follows: "The trial court . . . charged the jury that the certificate which appellants caused to be issued . . . is a 'security' within the meaning of the Corporate Securities Act, and refused to give an abstract definition of the word 'security' in the language of the statute. This was the proper course to pursue. Whether the certificate constituted a 'security' under the conceded facts of the case was a question of law for the court and did not involve any question of fact whatever. The requested instruction would have left it to the jury to determine as a question of fact what the court rightfully disposed of as a question of law for its sole determination." (63 Cal.App. at pp. 792-793.)

particularly surprising in view of the fact that the rule prohibiting directed verdicts was enunciated as early as 1895 by the Supreme Court in *Sparf and Hansen* v. *United States, supra,* 156 U.S. 51. Perhaps the courts in *McCalla, Marvin,* and *Dutton* may be forgiven for failing to address the issue because of the relative age and/or obscurity of that case. However, the *Skelton* court could not rely on this excuse. By 1980, when that case was decided, the rule had been soundly reaffirmed by the high court two times— in *Brotherhood of Carpenters* and *Martin Linen Supply Co.*—and the basis for the rule reaffirmed twice more in *Winship* and *Sandstrom.*[21]

Moreover, in light of the analysis in *United States* v. *Johnson, supra,* 718 F.2d 1317 and other cases, the two premises discussed above (*ante,* p. 730) are questionable ones upon which to sustain the trial court's instruction. ■ In many criminal cases, the prosecution's evidence will establish an element of the charged offense "as a matter of law." Similarly, in many instances, the accused will not seriously dispute a particular element of the offense. (Cf. *People* v. *Garcia, supra,* 36 Cal.3d at pp. 554, 556.) However, neither of these sometime realities of trial practice justifies the giving of an instruction which takes an element from the jury and decides it adversely to the accused. Such an instruction confuses the roles of judge and jury.[22]

In addition, if the "law/fact" distinction that the foregoing cases espouse is at all valid, it can only be in a very limited sense. ■ As the *Johnson* majority observed, "The definition of a security is a matter of law. It is the

---

[21]Although the Attorney General does not mention it, the recent appearance of *People* v. *Feno* (1984) 154 Cal.App.3d 719 [201 Cal.Rptr. 513] on the scene is significant. There, the Court of Appeal reversed a section 25110 conviction on the ground that the instructions erroneously gave the jury the impression that the accused had the burden of proof to show that the transaction did *not* involve a security. "By characterizing all joint ventures as 'exempt' the court necessarily assumed the joint venture interests . . . *were* securities. *The court erred in so assuming rather than instructing the jury to decide whether those interests were securities within the meaning of section 25019.*" (*Id.,* at p. 728, second italics added.)

[22]As the *United States* v. *Johnson* majority notes, there are two "historical exceptions" to this principle. (718 F.2d at p. 1324.) The first is that an accused facing a prosecution for contempt of Congress for refusing to answer questions is not entitled to have the jury decide whether the questions were "pertinent" to the congressional inquiry. (*Sinclair* v. *United States, supra,* 279 U.S. at p. 298 [73 L.Ed. at p. 700].) *Sinclair* has been both criticized and limited to its facts in recent times. (See *ante,* fn. 18.)

The second exception is that an accused facing a perjury charge for testifying falsely as to a "material" matter (cf. Pen. Code, § 118) is not entitled to have the question of "materiality" decided by the jury. (See *Sinclair, supra,* 279 U.S. at pp. 298-299 [73 L.Ed. at p. 700]; *People* v. *Sagehorn* (1956) 140 Cal.App.2d 138, 153 [294 P.2d 1062].)

As counsel for Joseph notes, the continuing validity of these rules may be doubtful in light of *In re Winship, supra,* 397 U.S. 358, and *Connecticut* v. *Johnson, supra,* 460 U.S. 73. In any event, like the majority in *United States* v. *Johnson,* this court is "reluctant to expand *Sinclair*'s sweep at the expense of the accused's right to interpose the jury between himself and the judge." (718 F.2d at p. 1324.)

judge's duty to instruct the jury concerning that definition: the way in which a security is identified. Whether a particular piece of paper meets that definition, however, is for the jury to decide. Of course, the question whether a generic type of document, such as a traveler's check or an equipment lease, may come within the reach of the statute's prohibition is one of law. [Citations.]" (718 F.2d at p. 1321, fn. 13.)[23]

■ For all of these reasons, the trial court's instruction here cannot stand. Instead of permitting the jury to find for itself that the note given Kurrle was a "security" within the meaning of section 25019, the trial court removed that issue from the jury and directed a finding on it. This was error, particularly since it was not a foregone conclusion that the note given to Kurrle *was* a "security" under the statute.[24] To understand this point, it is necessary to examine the meaning of that term as it is used in section 25019.

■ The list of instruments which come within the statutory definition of a "security" (*ante,* fn. 9) is an expansive one. However, the cases have adhered to the principle that substance governs over form. "[A] literal interpretation [of the statute] has been uniformly eschewed when to do so would appear to exceed any legitimate legislative purpose." (*People* v. *Schock* (1984) 152 Cal.App.3d 379, 384-385 [199 Cal.Rptr. 327]; *Leyva* v. *Superior Court* (1985) 164 Cal.App.3d 462, 473 [210 Cal.Rptr. 545].)

---

[23]The Attorney General's final argument is that an instruction like the one given here is essentially a proper comment on the evidence, since it does not tell the jury "what facts it should find, but only states the legal characterization of the particular undisputed state of facts." In the context of this case, the argument lacks merit.

Whatever the bounds of appropriate judicial comment, the present instruction went far beyond them. At no time did the trial court indicate that it was merely expressing an opinion on the state of the evidence or that the jury would have the final say on whether the Kurrle note was a "security." As both parties clearly understood, the issue was no longer for the jury's consideration.

[24]Justice Reynoso's concurrence is critical of the "extended analysis" which we undertake in reaching this conclusion. He would prefer that today's holding be based on the premise that the instruction in issue "depended on questions of fact . . . ." (Conc. opn., *post,* at p. 741.)

This premise is simply a recasting of the old "law/fact" distinction which ignores the due process and jury trial rights implicated in the giving of such an instruction. Moreover, adoption of that premise would lead to a case-by-case determination as to whether instructions of the type given here were permissible. Since today's opinion should guide not only the trial judge in this case on retrial but also trial and appellate judges throughout this state, some guidelines—and analysis—beyond the facts of this case are necessary.

It also bears noting that instructions like the one given here may not always constitute prejudicial error. While reversal of the judgment for the error discussed in Part II of this opinion renders it unnecessary to decide what standard of prejudice should be used to assess the trial court's instruction, today's opinion should not be read as compelling a reversal in every case in which similar instructions were given. (Cf. *People* v. *Garcia, supra,* 36 Cal.3d at pp. 550-557.)

Thus, the "critical question" the courts have sought to resolve in these cases is whether a transaction falls within the regulatory purpose of the law regardless of whether it involves an instrument which comes within the literal language of the definition. In *Silver Hills Country Club* v. *Sobieski* (1961) 55 Cal.2d 811, 813-816 [13 Cal.Rptr. 186, 361 P.2d 906, 87 A.L.R.2d 1135], for example, the court pursued that inquiry with respect to the sale of country club memberships even though the transaction involved a "beneficial interest in title to property" which was listed in the statute.[25]

The court engaged in a similar analysis in *Fox* v. *Ehrmantraut* (1980) 28 Cal.3d 127, 139 [167 Cal.Rptr. 595, 615 P.2d 1383], which involved the sale of the stock of an executive placement firm, even though "stock" is one of the instruments listed in section 25019. (28 Cal.3d at pp. 132-133, 137-138; see also *id.*, at p. 139 ["Bona fide agreements for the sale of services providing for profit sharing have been held not to come within the act, although profit sharing agreements, like stock, are included in the broad definition of security in section 25019"].)[26]

The California decisions involving instruments designated as "notes" are consistent with this principle. ■ Over 40 years ago, in *People* v. *Davenport* (1939) 13 Cal.2d 681 [91 P.2d 892], this court observed that "it plainly was not the legislative intent that '*every*' note or evidence of indebtedness, regardless of its nature and of the circumstances surrounding its execution, should be considered as included within the meaning and purpose of the act." (*Id.*, at p. 686.)[27]

---

[25]*Silver Hills* arose under the 1949 version of the Corporate Securities Law (Stats. 1949, ch. 384) which had codified the many amendments to the 1917 Corporate Securities Act (Stats. 1917, ch. 532). In 1968, the 1949 law was repealed and replaced by the present law. (Stats. 1968, ch. 88). The definition of "security" presently in section 25019 was previously found in section 25008.

[26]The federal decisions—to which this court looks for guidance on the issue (see *ante*, fn. 14)—also hold that it is not the label affixed to a particular instrument which determines whether it constitutes a "security." "[I]n searching for the meaning and scope of the word 'security' in the Act, form should be disregarded for substance and the emphasis should be on economic reality." (*Tcherepnin* v. *Knight* (1967) 389 U.S. 332, 336 [19 L.Ed.2d 564, 569, 88 S.Ct. 548]; accord *United Housing Foundation, Inc.* v. *Forman* (1975) 421 U.S. 837, 848-852 [44 L.Ed.2d 621, 629-632, 95 S.Ct. 2051].)

The high court has recently reaffirmed its commitment to the principle that substance governs over form. (*Landreth Timber Co.* v. *Landreth* (1985) 471 U.S. 681, 686-687 [85 L.Ed.2d 692, 697-698, 702-703, 105 S.Ct. 2297, 2302, 2306].)

[27]At oral argument, the Attorney General contended that this statement is no longer good law. He is in error.

At the time of *Davenport*, the securities law contained an exemption for all "[p]romissory notes, whether secured or unsecured, where the notes are not offered to the public . . . ." (Stats. 1933, ch. 898, § 1, p. 2312.) That exemption survived the 1949 recodification of the law (see Stats. 1949, ch. 384, § 1, p. 702) and was enacted as section 25102, subdivision

In at least two cases, notes have been held to qualify as securities because the transaction falls within the regulatory purpose of the law. For example, in *People* v. *Leach* (1930) 106 Cal.App. 442 [290 P. 131], upheld in *In re Leach* (1932) 215 Cal. 536, 546 [12 P.2d 3], the Court of Appeal held that undersecured notes on real property were "securities" on the ground that they were "unload[ed] upon a trusting public . . . for a consideration far in excess of their reasonable value" and, therefore, did not "protect the public against the imposition of [an] unsubstantial scheme . . . ." (106 Cal.App. at p. 450.)

Similarly, in *People* v. *Walberg* (1968) 263 Cal.App.2d 286 [69 Cal.Rptr. 457], the court found that unsecured, interest-bearing promissory notes which were issued for loans solicited to refurbish a hotel were "securities." The court relied in part on the fact that the scheme "was quite as dangerous to investors as the typical blue-sky promotion of mining stocks and royalties." (*Id.*, at p. 291.)

▬ These cases underscore the fact that the corporate securities laws do not contain an "all-inclusive formula by which to test the facts in every case. And the courts have refrained from attempting to formulate such a test. Whether a particular instrument is to be considered a security within the meaning of the statute is a question to be determined in each case. In arriving at a determination the courts have been mindful that the general purpose of the law is to protect the public against the imposition of unsubstantial, unlawful and fraudulent stock and investment schemes and the securities based thereon. [Citation.]" (*People* v. *Syde, supra,* 37 Cal.2d at p. 768.)

Some 25 years ago, this court in *Silver Hills Country Club* v. *Sobieski, supra,* 55 Cal.2d 811 introduced the concept of "risk capital" as a way to determine whether a transaction involves a "security." "Section 25008 defines a security broadly to protect the public against spurious schemes, however ingeniously devised, to attract risk capital. . . . [¶] . . . [The] objective [of the Corporate Securities Law] is to afford those who risk their capital at least a fair chance of realizing their objectives." (*Silver Hills, supra,* 55

---

(c). The 1968 recodification of the law *expanded* the exemption to "[a]ny offer or sale of *any* evidence of indebtedness, whether secured or unsecured . . . in a transaction not involving any public offering." (§ 25102, subd. (c), italics added; Stats. 1968, ch. 88, § 2, p. 251.) Thus, the statement in *Davenport* has been *reaffirmed* rather than undermined by subsequent legislative action.

Cal.2d at pp. 814-815; accord *Fox* v. *Ehrmantraut, supra,* 28 Cal.3d at p. 139.)[28]

Thus, for example, "where the investor receives adequate collateral, no risk capital is contributed to the managerial efforts of the promoter and such business transaction does not come within the Corporate Securities Law." (*People* v. *Schock, supra,* 152 Cal.App.3d at p. 386; see, e.g., *Hamilton Jewelers* v. *Department of Corporations, supra,* 37 Cal.App.3d at p. 336 [offer of sale of diamond with right to return it for full purchase price plus 5 percent interest not a security since no "risk capital" placed with the jeweler; diamond itself served as adequate collateral].)

The inadequacy of collateral, however, is not the only factor. As *Silver Hills* notes, "'a passive position on the part of the investor'" is also a factor relevant to whether a security is involved. (See 55 Cal.2d at p. 815, quoting Dahlquist, *Regulation and Civil Liability Under the California Corporate Securities Act* (1945) 33 Cal.L.Rev. 343, 360.)

This factor was the focus of this court's analysis in *People* v. *Syde, supra,* 37 Cal.2d 765. *Syde* involved agreements between a promoter and parents for the production of films featuring their children. The contracts called for the payment of specified sums over the period of rehearsals and guaranteed the cast members a percentage of the gross receipts upon the sale or distribution of the film.

In analyzing whether the film contracts were "securities," the court explained, "[i]t is settled that the Corporate Securities Law was not intended to afford supervision and regulation of instruments which constitute agreements with persons who expect to reap a profit from their own services or other active participation in a business venture. Such contracts are clearly distinguished from instruments issued to persons who, for a consideration paid, stipulate for a right to share in the profits or proceeds of a business enterprise to be conducted by others; and the court will look through form to substance to discover whether in fact the transaction contemplates the conduct of a business enterprise by others than the purchasers, in the profits

---

[28]The federal cases have focused on "whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others." (*S.E.C.* v. *Howey, supra,* 328 U.S. at p. 301 [90 L.Ed. at p. 1251].) "The touchstone is the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others." (*United Housing, supra,* 421 U.S. at p. 852 [44 L.Ed.2d at p. 632].)

It is unnecessary in this case to explore the precise relationship between the federal and state tests. For present purposes, the federal cases are significant because they underscore the necessity of looking through form to substance. (See *ante,* fn. 26.)

or proceeds of which the purchasers are to share. [Citations.]" (*People* v. *Syde, supra,* 37 Cal.2d at pp. 768-769.)[29]

Applying these facts, the court held that the contracts did not constitute securities. "The artist invested in returns from his training and actual participation in the production of a film if profits were realized from a sale thereof. It was not contemplated that he was to play the passive role of an investor only. True the direction in the production and the marketing of the film lay exclusively in the management of the defendants. But the film from which the artist was to profit could not be produced without his actual participation as a member of the cast." (*Id.,* at p. 769.)

The court in *People* v. *Coster* (1984) 151 Cal.App.3d 1188 [199 Cal.Rptr. 253], employed a similar analysis, reaching a contrary conclusion on its facts. There, the notes given the investors provided both a fixed return and a percentage of the gross company income. The court found that the transaction came within the purpose of the securities law since "the latter payment obviously depended on the success of the business" (151 Cal.App.3d at p. 1195), which "defendant managed, controlled and operated. . . ." (*Id.,* at p. 1194.) "[T]he investors had no authority in its conduct; the profit on their investments depended solely on defendant's expertise, skill, and honesty. . . . [T]hey may be described as 'relatively uninformed' regarding the operation of defendant's business." (*Ibid.*)

The Attorney General contends that the foregoing cases are inapposite since they involved "investment contracts" rather than "promissory notes." ■ He claims that evidence of an investor's active participation in a business is irrelevant where the instrument is denominated a "promissory note" since on its face a promissory note contemplates a guaranteed rate of return of both principal and interest. Thus, he argues, an investor's participation in the business, even if substantial, cannot affect the investment and the transaction should be subject to securities regulation.

This argument is without merit. The return on any investment which has not been secured with adequate collateral depends on the success of the business. This is true whether the investment contemplates a percentage of the profits or a fixed return. When an investor entrusts money or other

---

[29]Other courts have expressed similar views. "If the transaction is one in which the assignee is merely an investor who for consideration is given the right to share in the profits or proceeds of an enterprise to be conducted by others, the instrument representing such interest is a security," but where the investor "is to share in the conduct of the enterprise, the instrument . . . is not a security within the act." (*Austin* v. *Hallmark Oil Co.* (1943) 21 Cal.2d 718, 727 [134 P.2d 777]; accord *Tomei* v. *Fairline Feeding Corp.* (1977) 67 Cal.App.3d 394, 399 [137 Cal.Rptr. 656] ["cattle feeding arrangement" held to be a security since investor was passive].)

consideration to a promoter through any arrangement but retains substantial power to affect the success of the enterprise, he has not "risked capital" within the meaning of the Corporate Securities Law. In such transactions, that law should not govern.

Moreover, a rule which brings an undersecured "promissory note" within the ambit of the Corporate Securities Law simply because it guarantees a fixed return would be illogical in situations where the note is part of a transaction which contemplates substantial investor participation. Such a rule would place undue emphasis on the label attached to a particular instrument, ignoring the dictate that the courts must look to the substance of the transaction to determine whether protection of the securities laws is necessary.

There is an additional consideration. Many "investment contracts"—instruments which concededly permit consideration of investor participation in determining whether they constitute "securities"—contemplate both a variable and a fixed return. The investment contracts in *Coster,* for example, purported to give the investor a 20 percent "fixed" return on principal and 1 percent of the gross company income. (151 Cal.App.3d at pp. 1191-1192.) Both kinds of return, as well as a recoupment of principal, depended on the success of the business, which in turn depended upon the efforts of the promoter. It would be illogical to permit consideration of evidence of investor participation in that instance to determine whether the transaction should be subject to securities regulation while forbidding it in a promissory note transaction simply because the promised return in the latter is to take the form of interest at a "fixed" rate.

Finally, at least one case involving a promissory note has looked to investor participation in determining whether a note was a "security." *People* v. *Schock, supra,* 152 Cal.App.3d 379 involved fractional interests in promissory notes and related deeds of trust. In concluding that the notes were "securities," the court relied on the fact that the "investors possessed no real knowledge *or control* over the [business]. The *passive role occupied by the investors* compelled full reliance on [defendant's company] for the success or failure of the common enterprise." (*Id.,* at p. 388, fn. 6, italics added;[30] accord *Leyva* v. *Superior Court, supra,* 164 Cal.App.3d at pp. 472-475.)

---

[30]*Schock* also relied on a federal case which had concluded that certain promissory notes were "securities" in part because of the passive role assumed by the investor. (*Id.,* at p. 388; *United States* v. *Farris* (9th Cir. 1979) 614 F.2d 634, 641 [noteholders were unsophisticated "widows, widowers, and the elderly; moreover, there was no access to [the defendant's] books for anyone but those in a small inner circle of the company. . . . [¶] . . . [T]he noteholders . . . placed substantial trust in the management skill and solvency of [the defendant]"]; see also *United States* v. *Carman* (9th Cir. 1978) 577 F.2d 556, 563 [crucial factor was that investors in school loan packages were placed "in a totally passive role"].)

It is evident from the foregoing analysis that Kurrle's participation in appellants' business was relevant to the issue of whether the "Corporation Promissory Note" was a "security." Therefore, not only was it improper for the court to take the issue from the jury, but consideration of that evidence by the jurors was essential to determine that issue.

For example, it is noteworthy that appellants' initial offering through the newspaper ad contemplated "[a]ctive or nonactive" partners. From the time of their first meeting, Kurrle's active participation in the Figueroa businesses was encouraged. Kurrle not only talked to Joseph with the idea of "getting involved in the company actively, possibly in the sales area or management area," but Joseph made it clear that he would be made an officer in at least one of the corporations "immediately or fairly immediately" after he invested. Eventually, Kurrle did begin working in the office. He became secretary/treasurer of Financial and Insulation, was a signatory on the company bank accounts, had a telephone listing as "Arlo Kurrle, Financial Consultant," and obtained a business license. The work he did for Joseph and Financial consisted of updating loan source lists and contacting potential lenders under a "finder's fee" arrangement with Joseph. He also developed a demonstration kit used by Dennis in his sales presentations and accompanied Dennis on calls.[31]

It may be, of course, that these aspects of Kurrle's participation were mere "window dressing" and that in fact, the success of his investment was never intended to depend on his "professional or managerial skill [or the] authority corresponding with his responsibility . . . ." (*Coster, supra,* 151 Cal.App.3d at p. 1194.) The record does suggest that appellants had no real intention of employing Kurrle's talents in managing any of the three companies and that they contemplated that only *their* skill and services would determine the fate of the investment.

However, resolution of this question was for the jury in the first instance, not for the trial court. That resolution was further complicated by the court's ruling excluding evidence regarding Kurrle's contemplated participation in the business. Thus, in the event of a retrial, the trial court should permit such evidence. It should also, at a minimum, instruct the jury in the statutory definition of a "security." Should appellant request additional instruc-

---

[31]The record contains several suggestions that Kurrle's participation was pursuant to an employment contract under which he was to obtain a specified percentage of the sales of the company. The trial court, however, sustained objections to all but a few questions regarding this agreement, finding that it was not relevant to the charged offenses. This ruling was in error, since the details of Kurrle's employment relationship might have indicated whether he was expected to have a significant role in the management of the business and, therefore, in the success of his investment.

tions on the "investor passivity" factor, the trial court should give an appropriate instruction to conform to the evidence presented.[32]

## IV.

"Put simply, the right to be tried by a jury of one's peers finally exacted from the king would be meaningless if the king's judges could call the turn." (*United States* v. *Spock, supra,* 416 F.2d at p. 181, fn. omitted, citing *Bushell's Case,* 124 Eng. Rep. 1006 (C.P. 1670).) On the issue of whether a "security" had been offered or sold to Kurrle, the trial judge did not confine himself to instructing the jury about abstract legal principles or commenting on the evidence. He usurped the jury's province and applied the law to the facts as he understood them. The court's instruction erroneously removed an element of the section 25110 charge from the jury's consideration.

In addition, the trial court erred in refusing to instruct the jury that appellants were required only to raise a reasonable doubt as to whether the offering was exempted from the qualifications requirement of section 25110. The court compounded that error by instructing that it was unlawful to offer or sell any security unless the security had been "exempted with the Commissioner of Corporations." These errors require reversal of the judgment. On retrial, the trial court should permit evidence of Kurrle's participation in appellants' businesses.

The judgment is reversed.

Mosk, J., Broussard, J., Grodin, J., and Takei (Taketsugu), J.,* concurred.

**REYNOSO, J.,** Concurring.—The instruction that the notes in question were "securities" was error because, as the majority makes clear, that proposition depended on questions of fact, relating to Kurrle's participation in appellants' business, which should have been submitted to the jury. (*Ante,* at pp. 734-741.) I agree that the trial court erred in excluding evidence on that subject. (*Ante,* at p. 740, fn. 31, p. 741.)

On that state of the record it is wholly unnecessary to decide whether, as the majority holds, an instruction that the notes were securities would be

---

[32]A similar procedure was employed in *United States* v. *Carman, supra,* 577 F.2d at page 563, in a prosecution for securities fraud under the federal securities laws.

*Judge, Santa Clara County Superior Court, assigned by the Chairperson of the Judicial Council.

erroneous no matter how convincing the evidence was on this issue (*ante*, pp. 733-734). The complexities involved are demonstrated by the sharp divisions in the federal and California decisions and the extended analysis the majority finds necessary to undertake before arriving at a conclusion. (See *ante*, pp. 727-734.) From that analysis the majority distills an absolute rule that apparently would prohibit in criminal trials, regardless of the state of the evidence, such instructions as one that a particular automobile is a motor vehicle or one that a particular gun is a firearm. (See *United States* v. *Johnson* (5th Cir. 1983) 718 F.2d 1317, 1324.) I would eschew such judicial rule-making until the need arises.

Accordingly, I concur in the judgment and join in parts I and II of the majority opinion but not in all of part III.

Lucas, J., concurred.